**TEXAS HEALTH AND HUMAN SER-
VICES COMMISSION AND OFFICE
OF INSPECTOR GENERAL, Appel-
lants**

v.

**ANTOINE DENTAL CENTER,**
Appellee

No. 06–15–00076–CV

Court of Appeals of Texas,
Texarkana.

Submitted: February 4, 2016

Decided: April 7, 2016

Raymond C. Winter, Reynolds B. Brissenden, Noah Reinstein, Office of the Attorney General, Austin, TX, for appellant.

Jason D. Ray, Riggs & Ray, P.C., Austin, TX, for appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Bailey C. Moseley, Justice

The Texas Health and Human Services Commission and the Office of Inspec-

tor General[1] (HHSC–OIG) sent notice to Antoine Dental Center (the Clinic) that they were withholding payment to the Clinic for alleged acts of fraud or wilful misrepresentation in attempting to obtain payment from Medicaid for dental services performed on Medicaid patients. The Clinic appealed the payment hold.[2] After a full and contentious hearing before administrative law judges (ALJs) from the State Office of Administrative Hearings, (SOAH), the Clinic obtained a ruling that the payment hold should be reversed.[3] The Executive Commissioner of the Texas Health and Human Services Commission (HHSC), Kyle Janek, M.D., altered the ALJs' findings of fact and conclusions of law and issued a final order sustaining the HHSC–OIG's payment hold.

Arguing that Janek was without authority to change the ALJs' findings, the Clinic appealed to the 200th Judicial District Court of Travis County, Texas.[4] After reviewing the record, the trial judge entered an order reversing Janek's final order. The HHSC–OIG appeals. Because we determine that the trial court properly reversed Janek's order, we affirm the trial court's judgment.

## I. We Have Jurisdiction Over this Appeal

The "HHSC is the state agency designated to administer the Texas Medicaid program." *Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97, 99 (Tex. App.–Austin 2014, no pet.) (citing TEX. GOV'T CODE ANN. § 531.021(a) (West 2012)). "Through its OIG, [the] HHSC is responsible for investigating fraud and abuse and enforcing state laws related to the Medicaid program." *Id.* "Texas law permits [the] HHSC (and commands the OIG) to impose, without prior notice, a 'payment hold' on Medicaid reimbursements to a Medicaid provider upon receiving reliable evidence of 'fraud or willful misrepresentation' by the provider under the state Medicaid program." *Id.* (quoting TEX. GOV'T

---

1. It is the wont of many administrative agencies to regularly employ the use of acronyms for agencies, entities, or procedures. This can be very helpful for those commonly using those acronyms, but quite annoying to those who are unaccustomed to seeing them. For the sake of brevity, acronyms are widely used in this opinion. Even though this practice promotes some redundancy, the true meaning of the acronym may be repeated in the body of this opinion when it is first used, but this footnote will allow the reader whose head swims with the capital letters to locate a singular place to attribute an actual phrase to the acronym involved. Some of the acronyms employed herein are as follows: HHSC, meaning "Texas Health and Human Services Commission"; OIG, meaning "Office of the Inspector General"; HHSC–OIG, meaning "Office of the Inspector General of the Texas Health and Human Services Commission"; ALJ, meaning "Administrative Law Judge"; SOAH, meaning "State Office of Administrative Hearings"; CAF, meaning "credible allegation of fraud"; and HLD, meaning "Handicapping Labio-lingual Deviation."

2. "Payment hold" means "the temporary denial of reimbursement under Medicaid for items or services furnished by a specified provider." TEX. GOV'T CODE ANN. § 531.101(6) (West Supp.2015).

3. "[A] payment hold imposed pursuant to Government Code section 531.102(g) is temporary and must end under the circumstances outlined in the applicable federal and state regulations." *Harlingen Family Dentistry, P.C. v. Tex. Health & Human Servs. Comm'n*, 452 S.W.3d 479, 488 (Tex.App.–Austin 2014, pet. dism'd).

4. Originally appealed to the Third Court of Appeals in Austin, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Third Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

CODE ANN. § 531.102(g)(2)). "A Medicaid provider subject to such a hold may request an expedited administrative hearing before the State Office of Administrative Hearings (SOAH) regarding the hold." *Id.* at 99–100. "The duration of such a hold is not indefinite but depends initially on the outcome of the expedited SOAH hearing." *Id.* at 100. Administrative law judges preside over SOAH hearings.

■ The current statutes in place have removed the ability to appeal the final administrative order to a district court by stating, "Notwithstanding any other law . . ., the decision of the administrative law judge is final and may not be appealed." TEX. GOV'T CODE ANN. § 531.102(g)(5). The presumption that statutes apply prospectively "does not apply when the statute or amendment is procedural or remedial." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 219 (Tex.2002). The recent overhaul of the statutory scheme was designed to "[s]treamline[ ] the credible allegation of fraud (CAF) payment hold appeal process." SENATE HEALTH & HEIMAN SERVS. COMM., BILL ANALYSIS, TEX. S.B. 207, 84th Leg., R.S. (2015). Through its Bill Analysis, the Texas Legislature clarified in the following paragraph that the enactment of the current version of Section 531.102 was, in fact, remedial in nature:

> In its first review of OIG, conducted as part of the HHSC review, the Sunset Advisory Commission (Sunset) found deep management and due process concerns, particularly in OIG's efforts to detect and deter Medicaid fraud, waste, and abuse. OIG's investigative processes lack structure, guidelines, and performance measures to ensure consistent and fair results. Poor communication and a lack of transparency give a perception that OIG makes up rules as it goes. These significant concerns and vague accountability between the governor and the executive commissioner of [the] HHSC (executive commissioner) demand serious attention to set this office right so it can appropriately ensure the integrity of programs in the health and human services system.[5]

*Id.* Specifically, the purpose of removing the right to appeal the final administrative order was to "[s]horten[ ] timeframes and limit[ ] the scope of appeal hearings to more quickly mitigate state financial risks." *Id.* However, Section 15 of Senate Bill 207 made amendments to Section 531.102 prospective, by stating,

> Section 531.102, Government Code, as amended by this Act, applies only to a complaint or allegation of Medicaid fraud or abuse received by the Health and Human Services Commission or the commission's office of inspector general on or after the effective date of this Act. A complaint or allegation received before the effective date of this Act is governed by the law as it existed when the complaint or allegation was received, and the former law is continued in effect for that purpose.

Act of May 30, 2015, 84th Leg., R.S., ch. 945, § 15, 2015 Tex. Sess. Laws Servs. 3304, 3315 (West); *see* SENATE HEALTH & HUMAN SERVS. COMM'N, BILL ANALYSIS, TEX. S.B. 207, 84th Leg., R.S. (2015). The prior version of Section 531.102, which applies to this case, provided for an appeal of the final administrative order by "filing a petition for judicial review in a district court in Travis County." *See* Act of May 21, 2013, 83d Leg., R.S., ch. 622, § 2, Sec.

---

**5.** As demonstrated below, this case is, in our opinion, representative of the Legislature's concerns.

531.102(g)(5), 2013 Tex. Gen. Laws 1677, 1678–79 (amended 2015) (current version at TEX. GOV'T CODE § 531.102(g)(5)). Because an appeal from a district court's judgment is authorized, we have jurisdiction over this appeal.

## II. Factual and Procedural Background

The factual background and the former statutory scheme are critical to understanding the parties' disputes. The parties argue over which statutes apply and what standards of review were appropriate during the proceedings below and in this appeal. We resolve these concerns by addressing them in this section.

### A. The HHSC Begins Investigating the Clinic

#### 1. Applicable Law

The procedures and standards that govern this appeal are contained in a prior version of Section 531.102 of the Texas Government Code.[6]

Former Section 531.102 provided,

(f)(1) If the commission receives a complaint of Medicaid fraud or abuse from any source, the office must conduct an integrity review to determine whether there is sufficient basis to warrant a full investigation. An integrity review must begin not later than the 30th day after the date the commission receives a complaint or has reason to believe that fraud or abuse has occurred. An integrity review shall be completed not later than the 90th day after it began.

(2) If the findings of an integrity review give the office reason to believe that an incident of fraud or abuse involving possible criminal conduct has occurred in the Medicaid program, the office must take the following action, as appropriate, not later than the 30th day after the completion of the integrity review:

(A) if a provider is suspected of fraud or abuse involving criminal conduct, the office must refer the case to the state's Medicaid fraud control unit, provided that the criminal referral does not preclude the office from continuing its investigation of the provider, which investigation may lead to the imposition of appropriate administrative or civil sanctions; or

(B) if there is reason to believe that a recipient has defrauded the Medicaid program, the office may conduct a full investigation of the suspected fraud.

(g) . . .

(2) In addition to other instances authorized under state or federal law, the office shall impose without prior notice a hold on payment of claims for reimbursement submitted by a provider to compel production of records, when requested by the state's Medicaid fraud control unit, or on receipt of reliable evidence that the circumstances giving rise to the hold on payment involve fraud or wilful misrepresentation under the state Medicaid program in accordance with 42 C.F.R. Section 455.23, as applicable. The office must notify the provider of the hold on payment in accordance with 42 C.F.R. Section 455.23(b).

Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.19, sec. 531.102(f)(1), (2), 2003 Tex. Gen. Laws 611, 651 (amended 2015) (cur-

---

6. Because the law was amended several times during the course of the Clime's proceedings, we apply the law as it existed when the complaints and allegations were first received.

See Act of May 30, 2015, 84th Leg., R.S., ch. 945, § 15, 2015 Tex. Sess. Law Serv. 3304, 3315 (West).

rent version at TEX. GOV'T CODE § 531.102(f)(1), (2) (West Supp. 2015)); Act of May 28, 2011, 82d Leg., R.S., ch. 879, § 3.11, 2011 Tex. Gen. Laws 2228, 2234–35 (amended 2015) (current version at TEX. GOV'T CODE § 531.102(g)(2) (West Supp. 2015)). Former Section 455.23(b) of the Code of Federal Regulations required that the HHSC's notice to the provider include "the applicable State administrative appeals process and corresponding citations to State law." Medicare, Medicaid, and Children's Health Insurance Programs, Additional Screen Requirements, Application Fees, Temporary Enrollment Moratoria, Payment Suspensions and Compliance Plans for Providers and Suppliers, 76 Fed. Reg. 5966 (Feb. 2, 2011) (codified as amended at 42 C.F.R. § 455.23 (West, Westlaw current through Mar. 10, 2016)).

## 2. How the Investigation Began

The Clinic is owned by Dr. Behzad Nazari, who employed orthodontist Wael Kannan to assist him. From 2009 to 2011, many of the Clinic's patients were Medicaid patients. "Orthodontic services for cosmetic reasons only are not a covered Medicaid service. Orthodontic services must be prior authorized and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [Texas Medicaid Provider Procedures Manual (the Manual) [7]]." 25 TEX. ADMIN. CODE § 33.71(a) (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Dep't of State Health Servs., Orthodontic Services & Prior Authorization). Pre-authorization allowed the Texas Medicaid Health Partnership, the Texas Medicaid claims administrator during the rele-

vant timeframe, to determine whether the orthodontic services were medically necessary.

To obtain prior authorization, the Clinic was required to submit Handicapping Labio-lingual Deviation (HLD) Index score sheets, which measure the existence and severity of malocclusion, together with supporting dental records to the claims administrator. The score sheet assigned a certain number of points for nine observed conditions: cleft palate deformity, severe traumatic deviations, overjet, overbite, mandibular protrusion, open bite, ectopic eruption, anterior crowding, and labio-lingual spread. Correction of severe handicapping malocclusion with full banding (braces) generally required a minimum score of twenty-six points on the HLD Index. If the HLD Index did not meet the twenty-six-point threshold, a provider could also submit a narrative to establish the medical necessity of the treatment.

In 2008, the HHSC–OIG issued a performance audit report of the claims administrator and discovered that its "prior authorization team failed to review the supporting documentation submitted by providers with the HLD score sheet as required," that its "staff did not have the dental credentials necessary to evaluate whether the additional documentation supported the HLD score," and that its "staff only referred about 10% of the orthodontic prior authorizations requests to [its] dental director for review." After failing to take corrective action, the claims administrator's dental director was terminated, and the HHSC–OIG conducted a data analysis of paid Medicaid claims.

7. From this point forward, when reference is made to "Manual" (in the singular), it is a reference to the *Texas Medicaid Providers Manual,* when reference is made to "Manu-

als" (in the plural), this is intended to be a reference to the 2008–2011 collection of manuals admitted as evidence in this case.

Following the HHSC–OIG's discovery, it began opening fraud investigations on the top twenty-five Medicaid providers, including the Clinic. Of the 6,500 cases that were preauthorized for medical services between 2009 and 2011, the HHSC–OIG randomly selected sixty-three cases to audit.

Dr. Charles D. Evans, a consulting orthodontist who reviewed the Clinic's scoring, opined in a February 21, 2012, report that the Clinic's scoring "was consistent and accurate in all areas except for the condition of 'Ectopic Eruption.'" However, because Dr. Evans believed that the Clinic's HLD scores were inflated (due to its findings of ectopic eruption conditions), he found fault with the overall scores tendered by the Clinic and deemed them erroneous. Based on the "100 percent error rate" for the sixty-three audited cases, the HHSC–OIG determined that fraud was involved.[8]

### B. The HHSC–OIG Sends Notice of a Payment Hold

The former version of Chapter 371 of the Administrative Code provided for a payment hold for program violations, without prior notice, if prima facie evidence existed to support the payment hold. 29 Tex. Reg. 5855 (2004), *adopted* 29 Tex. Reg. 12157 (2004), *repealed by* 37 Tex. Reg. 5869, *adopted* 37 Tex. Reg. 7988–90 (2012) (former 1 Tex. Admin. Code § 371.1703) (Tex. Health & Human Servs. Comm'n, Termination of Enrollment or Contract).[9] Former Section 371.1617 provided,

Violations result from a provider or person who knew or should have known that the following were violations....

(1) Claims and Billing

(A) submitting or causing to be submitted a false statement or misrepresentation, or omitting pertinent facts when claiming payment under Medicaid or other HHS program or when supplying information used to determine the right to payment under Medicaid or other HHS program;

(B) submitting or causing to be submitted a false statement, information or misrepresentation, or omitting pertinent facts to obtain greater compensation than the provider is legally entitled to;

(C) submitting or causing to be submitted a false statement, information or misrepresentation, or omitting pertinent facts to meet prior authorization requirements;

. . .

(I) presenting or causing to be presented to an operating agency or its agent a claim that contains a statement or representation that the person knows or should have known to be false;

. . .

(K) billing or causing claims to be submitted to the Medicaid or other HHS program for services or items that are not reimbursable by the Medicaid or other HHS program....

---

8. We consider Evans' report as the complaint that initiated the payment hold. On March 29, 2012, the Medicaid Fraud Control Unit, a specific division of the Office of the Attorney General, opened an investigation into the Clinic based on the HHSC–OIG's referral.

9. Chapter 371 was repealed in 2012 and replaced by a new regulatory scheme. However, the HHSC intended that a "program violation committed before the effective date of the proposed rules be governed by the prior rules and provisions of Subchapter G that were in effect when the program violation was committed; and that the repealed provisions of Subchapter G continue in effect for this purpose. 37 Tex. Reg. 7989, 7990 (2012).

29 Tex. Reg. 12142, 12143–44 (2004), *repealed by* 37 Tex. Reg. 5871 (2012), *adopted*, 37 Tex. Reg. 7989 (2012) (former 1 TEX. ADMIN. CODE § 371.1617) (Tex. Health & Human Servs. Comm'n, Finality & Collections). Former Section 32.0291(b) of the Texas Human Resources Code also provided,

> [T]he department may impose a postpayment hold on payment of future claims submitted by a provider if the department has reliable evidence that the provider has committed fraud or wilful misrepresentation regarding a claim for reimbursement under the medical assistance program. The department must notify the provider of the postpayment hold not later than the fifth working day after the date the hold is imposed.

Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.103, sec. 32.0291(b), 2003 Tex. Gen. Laws 611, 690 (amended 2013) (current version at TEX. HUM. RES. CODE § 32.0291(b)).

On April 4, 2012, based on Evans' report, the HHSC–OIG sent the Clinic a notice of payment hold on all future claims. Former Section 531.102(g) provided,

> (3) On timely written request by a provider subject to a hold on payment under Subdivision (2), other than a hold requested by the state's Medicaid fraud control unit, the office shall file a request with the State Office of Administrative Hearings for an expedited administrative hearing regarding the hold. The provider must request an expedited hearing under this subdivision not later than the 10th day after the date the

provider receives notice from the office under Subdivision (2).

Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.19, sec. 531.102(g)(3), 2003 Tex. Gen. Laws 611, 651–52 (amended 2013) (current version at TEX. GOV'T CODE § 531.102(g)(3) (West Supp. 2015)).

The Clinic challenged the payment hold and requested an expedited formal administrative appeal. The administrative procedures governing the Clinic's challenge to the payment hold were provided by a prior version of Section 32.0291(c) of the Texas Human Resources Code, which stated, "On timely written request by a provider subject to a postpayment hold under Subsection (b), the department shall file a request with the State Office of Administrative Hearings for an expedited administrative hearing regarding the hold." Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.103, sec. 32.0291(c), 2003 Tex. Gen. Laws 611, 690 (amended 2013) (current version at TEX. HUM. RES. CODE § 32.0291(c)).

The HHSC docketed the case with SOAH on November 7, 2012.[10] *See* 1 TEX. ADMIN. CODE § 357.482 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Definitions); 1 TEX. ADMIN. CODE § 371.1615 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Appeals). In its notice of hearing, the HHSC–OIG informed the Clinic that the purpose of the hearing was to determine whether a credible allegation of fraud existed to support the payment hold.

## C. SOAH Procedure and Applicable Law

---

**10.** "Upon receipt of a request to set a hearing at SOAH, the director of the HHSC Appeals Division will transfer the case to SOAH for a hearing and a proposal for decision within a reasonable time for disposition." 1 TEX. Ap-MIN. CODE § 357.484(d) (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Request for a Hearing).

In its formal complaint with SOAH, the HHSC–OIG alleged that

from about November 1, 2008 through August 31, 2011, the Petitioner submitted false statements, information or misrepresentations, or omitted pertinent facts to meet prior authorization requirements. Specifically, the [Clinic] submitted prior authorization forms misrepresenting the severity of patients' dental condition and was paid by Texas Medicaid for services for which the patients would not have qualified.

The HHSC–OIG's allegations focused on ectopic eruptions. The 2008–2011 Manuals provided that orthodontic services "for cosmetic purposes only" were not covered by Medicaid and provided that covered benefits included, "[c]orrection of severe handicapping malocclusion as measured on the Handicapping Labiolingual Deviation (HLD) Index." They further stated that "[a] minimum score of 26 points [was] required for full banding approval." Three points were assigned per each ectopic tooth. Under the Heading "How To Score the Handicapping Labio-lingual Deviation (HLD) Index," the 2008–2011 Manuals contained the following language under the subheading "Ectopic Eruption":

An unusual pattern of eruption, such as high labial cuspids or teeth that are grossly out of the long axis of the alveolar ridge. Do not include (score) teeth from an arch if that arch is to be counted in the following category of Anterior Crowding. For each arch, either the ectopic eruption or anterior crowding may be scored, but not both.

The Clinic denied the HHSC–OIG's allegations by stating that it had correctly filled out the HLD score sheets after relying on the Manuals' definition of ectopic eruption, which was merely "[a]n unusual pattern of eruption." The HSSC–OIG countered the Clinic's argument and supporting testimony by stating that the language describing ectopic eruptions in the Manuals was not a definition of ectopic eruption and that according to its experts and supporting orthodontic literature, ectopic eruption "means a tooth that erupts in the wrong place," which is a "rare condition."

The SOAH administrative hearings in this case were governed by former Section 2001.058 of the Texas Government Code, which required the HHSC to provide the ALJs with a written statement of applicable rules or policies and provided, "An administrative law judge who conducts a contested case hearing shall consider applicable agency rules or policies in conducting the hearing, but the state agency deciding the case may not supervise the administrative law judge." Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, sec. 2001.058(b), (c), 1993 Tex. Gen. Laws 583, 741 (amended 2015) (current version at TEX. GOV'T CODE § 2001.058(b), (c) (West Supp. 2015)).

The law in effect at that time read: "The department shall discontinue the hold unless the department makes a prima facie showing at the hearing that the evidence relied on by the department in imposing the hold is relevant, credible, and material to the issue of fraud or wilful misrepresentation." Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.103, sec. 32.0291(c), 2003 Tex. Gen. Laws 611, 690 (amended 2013). "'Fraud' means an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to that person or some other person, including any act that constitutes fraud under applicable federal or state law." Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.37A, sec. 531.1011(1), 2003 Tex. Gen. Laws 611, 661 (amended 2015) (current version at TEX. GOV'T CODE § 531.1011(1) (West Supp.2015)

(now providing that "[t]he term does not include unintentional technical, clerical, or administrative errors.")). In addition, the prior version of Section 36.002(1) of the Texas Human Resources Code provided that an unlawful act was committed if a person "knowingly ma[de] or cause[d] to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that [was] not authorized or that [was] greater than the benefit or payment that [was] authorized." Act of May 23, 2011, 82d Leg., R.S., ch. 398, § 2, § 36.002(1), 2011 Tex. Gen. Laws 1054, 1054 (amended 2015) (current version at TEX. HUM. RES. CODE § 36.002(1) (West Supp. 2015)). Section 36.0011 of the Texas Human Resources Code, which was in effect at all times material to this case, states,

> (a) For purposes of this chapter, a person acts "knowingly" with respect to information if the person:
>
> > (1) has knowledge of the information;
> >
> > (2) acts with conscious indifference to the truth or falsity of the information; or
> >
> > (3) acts in reckless disregard of the truth or falsity of the information.
>
> (b) Proof of the person's specific intent to commit an unlawful act under Section 36.002 is not required in a civil or administrative proceeding to show that a person acted "knowingly" with respect to information under this chapter.

TEX. HUM. RES. CODE ANN. § 36.0011 (West 2005).

### D. SOAH Hearings and Evidence

At the hearing, the HHSC–OIG bore the burden to make a prima facie showing that its hold was supported by evidence that was relevant, credible, and material to the issue of fraud or wilful misrepresentation. Its presentation in this case was altered by SOAH's decision in the case of *Harlingen Family Dentistry*, which was entered a few months before this case was docketed with SOAH.

### 1. The *Harlingen Family Dentistry* Case

In the *Harlingen Family Dentistry* case, the HHSC–OIG argued, and its experts testified, that the term ectopic eruption was defined in the Manuals. Evans was also the HHSC–OIG's witness in the *Harlingen Family Dentistry* case and testified that he relied on the definitions of ectopic eruptions to complete the HLD score sheets. In August 2012, SOAH entered a proposal for decision discussing Evans' opinions in the *Harlingen Family Dentistry* case. The Clinic provided evidence that in the *Harlingen Family Dentistry* case, (1) Evans excluded teeth that were rotated or turned because he did not "consider that being off of the ridge," (2) Evans' scores were much different from Harlingen Family Dentistry's expert's scores, (3) Evans failed to follow the Manual's directions by counting both ectopic eruption and anterior crowding on the scoresheets, but justified his mistake by stating, "This is the first time I've completed those sheets," (4) while Evans' interpretation of ectopic eruption and scoring of the patients differed from those of Harlingen Family Dentistry providers, Evans had no opinion about whether Harlingen Family Dentistry was engaged in fraud or willful misrepresentation because the Manual's definition was "slightly subjective," (5) Evans had treated no Medicaid patients and had no familiarity with the HLD score sheets prior to his work in the case; (6) the ALJs found Evans' testimony about HLD scoring was unreliable, and (7) the ALJs concluded that "Evans' view of ectopic eruption and his scoring of

the patients at issue—on which the state's allegations of fraud and misrepresentation primarily rest—are not credible, reliable, or verifying, and lack indicia of reliability." [11]

The ALJs also determined that the Manuals' definition of ectopic eruption was vague. In its exception to the ALJs' rulings in the *Harlingen Family Dentistry* case, the HHSC–OIG argued that "the problem" with the ALJs dismissal of Evans' opinion was that "it subsume[d] the belief that 'ectopic eruption' [wa]s either a dental phenomenon unique to the Medicaid population or that 'ectopic eruption' [wa]s a term of art within the Medical provider community" and that "[n]o evidence exists[ed] that either [was] true." After its arguments were unsuccessful in the *Harlingen Family Dentistry* case, the HHSC–OIG changed its tune. *See generally Janek*, 451 S.W.3d 97 (noting that the "HHSC adopted the ALJs' findings and conclusions in their entirety").

### 2. Arguments and Testimony in this Case

At the SOAH hearings in this case, Evans did not testify, and the HHSC–OIG argued that the editions of the Manuals did not actually define ectopic eruption. As shown below, the meaning of ectopic eruption for purposes of determining whether a patient qualified to receive Medicaid benefits was not equal to the textbook definition of ectopic eruption in dental literature. The Clinic argued that under the Manuals' definition, ectopic eruption could include slanted or rotated teeth that were grossly out of the long axis

of the alveolar ridge because they resulted in severe handicapping malocclusion.[12] The Clinic also included scientific literature discussing the differences of opinion in HLD scores among experts. In 2012, the Manual's language describing ectopic eruptions was altered to specify that "[e]ctopic eruption does not include teeth that are rotated or teeth that are leaning or slanted especially when the enamel-gingival junction is within the long axis of the alveolar ridge." While the Clinic argued that this was a significant change which altered the way they completed the score sheets, the HHSC–OIG argued that the 2012 amendment simply clarified the Manual.

Linda Marie Jackson Morris Altenhoff, a doctor of dental surgery and policy expert for the Texas Department of State Health Services, initially testified that the Manuals contained the definition of ectopic eruption, but later recanted that testimony by stating that the Manuals' language was "guidance and instructions to the providers as to how to score." Although she was not an orthodontist and had not treated private or Medicaid patients since 1994, Altenhoff testified about the Manuals' language. She stated that benefits were provided only to correct a severe handicapping malocclusion and further testified,

> Now, occlusion . . . is how the teeth come together, how they touch, the upper teeth to the lower teeth. Malocclusion is that touching is not appropriate or not accurate, so it's hitting differently than what the body, under ideal situations, would want the teeth to come together. . . .

---

11. The Clinic also included transcripts from the HHSC–OIG's experts in the *Harlingen Family Dentistry* case to demonstrate the HHSC–OIG's position that the definition of ectopic eruption was included in the Manuals.

12. "A severe handicapping malocclusion is defined by Texas Medicaid as compromised masticatory (chewing) function as a result of the existing relationship between the maxillary (upper) and mandibular (lower) dental arches."

Severe comes into the fact that it is not just that maybe there's a couple of teeth out of alignment and, therefore, they are handicapped to some degree. This is severe.

Altenhoff stated that Medicaid was concerned only about "the front teeth. Again, from canine to canine, upper and lower, that's the only place you can score ectopic eruptions." She confirmed that the term "axis" used in the language describing ectopic eruptions was a common term that was not defined by the Manuals. Altenhoff testified that she believed the 2012 additional language regarding rotated or slanted teeth was a clarification of what ectopic eruptions meant, although the *Texas Medicaid Bulletin* used to update the Manuals classified the 2012 language as a change.

Jack Stick, the OIG's Deputy Inspector General for Enforcement, testified that the HHSC-OIG determined that the Clinic's HLD scoring was fraudulent based on Evans' review of the score sheets. Evans' report stated that he applied the "definition" of ectopic eruption that was provided by the Manuals, but did not further explain his scoring. When asked how many times Evans' scores were different from the Clinic's score just because the teeth were slanted, Stick testified that he did not know. Evans did not testify at the hearing. While Stick claimed that the OIG had other evidence of program violations from its conversations with parents and the Clinic's staff, Stick was asked, "[W]hat credible allegations of fraud did you have other than Dr. Evans and those things that you listed that nobody has testified to here in—in this hearing," and he responded, "Em not aware that we had any." Stick testified that the Manuals governed "what a provider can do and can't do or how to bill or—or what to bill," but claimed that the Manuals did not provide a definition for ectopic eruption. During cross-examination, the Clinic established that Stick testified in his deposition that the Manuals provided the definition of ectopic eruption.

The ALJs heard that, after the HHSC-OIG had already issued the payment hold, it retained another orthodontist, Dr. Larry Tadlock, to review the Clinic's records. In his February 20, 2013, report, Tadlock, who looked only at the score for ectopic eruptions, determined that sixty-two of the sixty-three patient records did not support the HLD score assigned by the Clinic. Stick and Altenhoff's testimony that the Manuals did not define ectopic eruptions was supported by Tadlock, the HHSC-OIG's only testifying orthodontist, who specifically stated that he did not use the Manuals' language in scoring ectopic eruptions on the HLD score sheets.

Tadlock testified that there is a difference between Medicaid rules and orthodontic practice in terms of scoring, adding, "I think there is a dispute over what ectopic eruption is." Tadlock relied on the textbook definition in a textbook authored by Bill Proffitt. According to Tadlock, "[e]ctopic eruption in the wrong place means it's outside of the place where it was planning to go." Under this definition, Tadlock stated that a tooth is not ectopic if it is merely rotated or slanted. According to Tadlock's textbook definition, ectopic eruption of teeth other than in the first molars is rare. During cross-examination, the ALJs heard that Tadlock made mistakes on the score sheets of seventeen out of sixty-three patients.

The HHSC-OIG also introduced scientific articles in support of its case. Some of them were unhelpful to their position. For example, one article contained the following:

"In arriving at a workable classification of handicapping malocclusions, the Advi-

sory Committee realized early that they could not be too specific or precise in their definitions of handicapping malocclusions because of the infinite number of variations possible in malocclusion, and particularly, the individual variations in what constitutes a handicap. It was not possible to arrive at any definition which included simple objective criteria for evaluating the psychological as well as physical factors that create a physical handicap." The proposed HLD Index is an attempt to obtain a method which will complement and perhaps substitute for clinical judgment which, although useful to a degree, is vulnerable because it is entirely subjective. In speaking of "handicapping malocclusions," from a public health point of view, it would appear that the presence or absence of a *demonstrable* handicap is the *only* factor of public health interest. In our preoccupation with the definition and classification of malocclusion" however, we have lost sight of this, our primary objective. What is needed by the public health dentist, then, is an administrative tool, such as an index. In contradistinction, the orthodontist requires a classification as a *diagnostic* tool. The distinction between the two approaches is basic to our considerations. Furthermore, the concept of "handicapping malocclusion" seems to require further elucidation.

On behalf of the Clinic, Dr. James Orr testified that the definition of ectopic eruption in the Manuals, which applied only to Medicaid HLD scoring "to be able to identify the eligibility of a patient for the payment of braces," gave "a definition that obviously leaves room for any number—a limitless number of aberrations of positions of teeth and ectopic eruption" and that was "completely subjective." Orr testified that "[t]eeth that are not in proper occlusion have all kinds of side effects,

from broken teeth[,] to headaches[,] to helping to cause other teeth to fail in their role in the mouth" and that the teeth are considered dysfunctional if there is malocclusion. Orr scored the same files and concluded that all but one or two passed that met the HLD scoring criteria. He added that no false information was submitted by Nazari.

The Clinic's orthodontist, Wael Kannan, was next to testify. Kannan stated that he agreed with the Proffitt textbook definition in practice, which controls diagnosis and treatment of patients, but testified that Medicaid has a different definition, which controls the HLD index to determine if the patient will qualify for public funding. Kannan further explained that ectopic eruption is not a diagnosis but a description of the position of the tooth and that handicapping is "an extreme deviation of the norm." He stated that the Manuals' definition, "an unusual pattern of eruption," was not further defined. Kannan pointed out several differences between the Manuals' and textbook definition of ectopic eruption. To support his position that the Manuals' definition was broader, he noted that the example of ectopic eruption in the Manuals, "high labial cuspid or teeth that are grossly out of the long axis of the alveolar ridge," would not be a textbook ectopic eruption, but would be called an abnormal eruption.

Kannan testified that the Manuals' definition of ectopic eruption was vague and further stated that the inventor of the HLD scoresheet "eliminated the ectopic and anterior crowding because it is subjective," adding that "[t]he HLD data sheet Number D–10 show[s] seven components only." According to Kannan, both the Profitt textbook's and Manuals' definitions included slanted or leaning teeth as ectopic

eruptions.[13]  Kannan testified that the 2012 Manual change was a significant change because it "took off the rotated or slanted teeth." Kannan testified that he never attempted to misrepresent the scores or defraud Medicaid and went into great detail to explain his reasoning for the HLD scores of specific patients.

Nazari also testified that he made no misrepresentations on the HLD score sheets. He testified that he relied on the Manuals for the definition of ectopic eruption, which allowed him to include rotated and slanting teeth. Nazari explained that teeth are in the wrong place if they are rotated because "they are just grossly out of the long axis of the range."

Also included was the report of Dr. Irwin K. Ornish, which stated:

The seventh criteria is Ectopic Eruption of Anterior Teeth Only. The Texas Medicaid Provider Procedure Manual's HLD guideline describes ectopic eruption as "an unusual pattern of eruption and then gives only two vague examples such as "high labial cuspids" or "[teeth] that are grossly out of the long axis of the alveolar ridge[."] With only these two vague examples an orthodontist attempting to score this criteria is given an infinite number of ways to interpret this discrepancy. The term ectopic eruption is used in dental literature to describe the eruption of a tooth out of its normal or usual functional position. The manual uses the term "long axis of the alveolar

ridge." There are innumerable ways to interpret this.[[14]] .... If it is agreed that the axis of the alveolar ridge is a horizontal arch with all of the teeth aligned, crowded anterior teeth would have to be moved either forward or laterally to the ridge and therefore be considered to have erupted out of the ridge or ectopically.

Ornish further stated that only three out of the sixty-three cases did not qualify based on his review.

After hearing the evidence, the ALJs, Howard S. Seitzman and Catherine C. Egan, issued a proposal for decision on November 4, 2013, which recommended that the payment hold be discontinued. Specifically, the ALJs found (1) that only Evans had reviewed the HLD score sheets prior to the payment hold, (2) that it could not assess Evans' credibility because he did not testify, and (3) that the HHSC failed to produce prima facie evidence to support a credible allegation of fraud or wilful misrepresentation and failed to show that the Clinic filed claims for nonreimbursible services.

### E.  The Administrative Review

The Administrative Procedures Act (APA), found in chapter 2001 of the Texas Government Code, "does not expressly provide for the procedural steps to be taken to appeal a proposal for decision of the agency ALJ, hearing officer, or examiner. However, the APA does expressly

---

13.  Note Alternhoff's definition of severe handicapping malocclusion.

14.  To demonstrate the term's vagueness, Ornish raised the following questions:
Webster's dictionary defines "axis" as a real or imaginary line around which an object rotates or a central line around which the parts of a .... system etc. are arranged. Is the long axis of the alveolar ridge a horizontal or vertical line? Is a high labial cuspid off the axis horizontally

or vertically? If it is a vertical discrepancy than would not anterior teeth that erupted at different vertical levels be ectopic? If the axis is a horizontal arch then would teeth that erupt either labially or lingually to this arch not be ectopic? What part of the tooth must be of this "axis" to be considered ectopic? If the apex of the root of a tooth that is flared is on this line yet the crown protrudes is this not ectopic?

provide that the agency has the power to issue a final order in a contested case proceeding." Ron Beal, *From Proposal for Decision to Final Decision: What Happens in Between ?*, 15 Tex. Tech. Admin. L.J. 113, 125 (2013) (citing Tex. Gov't Code Ann. § 2001.062, 2001.141); *see* 45 Tex. Prac., Env't Law § 3:3 (2d ed.2015) (after a contested case hearing is concluded, the hearing examiner makes a proposal for a decision or "PFD," including proposed findings of fact and conclusions of law, for consideration by the responsible agency official, board, or commission).

The Texas Administrative Code states that "[a]n administrative review of a hearings decision is provided as set forth in §§ 357.701–357.703 of this chapter (relating to Purpose and Application, Definitions and Process and Timeframes)." 1 Tex. Admin. Code § 357.19 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Other Procedures). Section 357.703(a) provides, "The hearing officer makes the final administrative decision in a hearing for the HHS System agency and its designees, unless, in those instances related to benefits provided under the public assistance programs of Chapters 31, 32 and 33, Human Resources Code, the appellant or the appellant's representative files a request for an administrative review of the hearing decision." 1 Tex. Admin. Code § 357.703(a) (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Process & Timeframes); *see* 1 Tex. Admin. Code § 155.507 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (State Office of Admin. Hearings, Proposal for Decision); 1 Tex. Admin. Code § 357.497 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Proposals for Decision, Exceptions, and Replies); 1 Tex.

Admin. Code § 357.498 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Final Orders & Rehearing) ("The judge issues a final order for a case: (1) referred by [the] HHSC; or (2) when the law governing the case provides for a final order.").

The HHSC–OIG filed an exception to the ALJ's decision. *See* 1 Tex. Admin. Code § 155.507(c). Rick Gilpin was appointed to preside over the case. *See* 1 Tex. Admin. Code § 357.482 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Definitions) (defining the term "judge" as "a licensed attorney appointed by the director of the HHSC Appeals Division to preside over the case"). Although the agency could review the ALJ's decision, it could not ignore it.

There was a time in Texas when agency directors could, and did, ignore the conclusions of administrative hearing examiners. In response, the Texas Legislature created SOAH and limited agency discretion to change SOAH findings and recommendations. In this way, the legislature attempted to limit unfair outcomes by allocating decisional power between the two groups.

Brent Nelson, Users Beware: Primary Jurisdiction May Abdicate Another's Right to A Jury Trial, 10 Tex. Tech Admin. L.J. 291, 302 (2008) (citations omitted). To prevent agencies from ignoring ALJ rulings, the Legislature enacted Section 2001.058 of the Texas Government Code, which reads:

(e) A state agency may change a finding of fact or conclusion of law made by the administrative law judge, or may vacate or modify an order issued by the administrative judge, only if the agency determines:

(1) that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;

(2) that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed; or

(3) that a technical error in a finding of fact should be changed.

The agency shall state in writing the specific reason and legal basis for a change made under this subsection.

TEX. GOV'T CODE ANN.§ 2001.058(e) (West Supp. 2015).

Thus, Gilpin was to review the SOAH record and the ALJs' decision "for errors of law and errors of fact using the 'preponderance of evidence' standard," which is defined as meaning "that the evidence as a whole shows that the fact sought to be proved is more probable than not." *See* 1 TEX. ADMIN. CODE § 357.703(b)(3) (Tex. Health & Human Servs. Comm'n, Process & Timeframes). Gilpin was to make the final decision. *See* 1 TEX. ADMIN. CODE § 357.703(b)(4) (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Process & Timeframes). On February 27, 2014, the ALJs' decision was considered by the HHSC Appeals Division Judge Gilpin, and Gilpin reversed the decision.

**F. Janek Changes the ALJs' Findings**

Subsequently, Janek entered a final order on May 2, 2014, which also rejected the ALJs' decision. The order was presumably made under authority of Section 357.483 of the Texas Administrative Code, which states, "The judge is a designee of the HHSC Executive Commissioner for purposes of: (1) issuing default, final, and other orders, and (2) ruling on any motions for rehearing." 1 TEX. ADMIN. CODE § 357.483 (West, Westlaw current through 41 Tex. Reg. No. 1544, dated Feb. 26, 2016) (Tex. Health & Human Servs. Comm'n, Powers & Duties of the Judge).

In relevant part, Janek's order found:

[T]hat the SOAH ALJs erred in interpreting Texas Medicaid policy as allowing Medicaid providers to apply a special interpretation to the meaning of the phrase "ectopic eruption." The SOAH ALJs' determination that ectopic eruption has a special meaning for the purposes of Medicaid eligibility that is different from, and more liberal than, the interpretation of the phrase in the general practice of dentistry contravenes Texas Medicaid policy and Texas federal law.... The SOAH ALJs misapplied applicable law, agency rules, and policies, and then misinterpreted the testimony of witnesses regarding the limitations of Medicaid policy and regarding the meaning of ectopic eruption.

The Executive Commissioner further finds that the SOAH ALJs erred to the extent that they impermissibly misinterpreted and misapplied applicable law, rules, and policy which resulted in wrongly dismissing *prima facie* evidence that satisfies the evidentiary requirements to maintain a payment hold. The Executive Commissioner finds that the Inspector General presented relevant, credible, and material evidence that [the Clinic] submitted fraudulent or willfully misrepresented prior authorization requests and claims for reimbursement; ADC submitted claims for services not reimbursable; and [the Clinic] failed to maintain or provide records as required by law.

The Executive Commissioner further finds that the SOAH ALJs erred to the

extent that they relied on certain findings of fact in [the] HHSC's final order in *Harlingen Family Dental v. Texas Health and Human Services Commission, Office of the Inspector General.* The Executive Commissioner has determined that certain of the findings in the *Harlingen Family Dental* case incorrectly stated the law, rules, and Medicaid policy and cannot be relied on in this case. Specifically, the Executive Commissioner concludes that Finding of Fact No. 29 in the *Harlingen Family Dental* case was erroneous to the extent that it suggested that the Inspector General's retained expert Dr. Charles Evans was not qualified to be an expert because he did not treat Medicaid patients. That finding was erroneous and cannot be relied on in this case because State and federal laws require Medicaid patients to be treated to the same standard of care as patients in the general population. . . .

In addition, Finding of Fact No. 31 in the *Harlingen Family Dental* case erroneously stated and applied Texas law and Medicaid policy, to the extent that the finding suggested Medicaid policy interprets "ectopic eruption" differently and more expansively (or more liberally) then the condition is interpreted in the general practice of dentistry. . . .

*Harlingen Family Dental* Finding of Fact No. 33 was also erroneous to the extent that it explained away evidence of fraud by impermissibly claiming Dr. Evans was not a qualified expert witness. . . .

. . . .

The Executive Commissioner also finds that the SOAH ALJs failed to both properly articulate and then properly apply the Inspector General's evidentiary burden to the evidence presented. In order to maintain the payment hold, the Inspector General is required to present *prima facie* evidence that is relevant, credible, and material to the issue of fraud or willful representation, or *prima facie* evidence that [the Clinic] has committed other, non-fraudulent program violations.

Specifically, the Executive Commissioner finds that the Inspector General presented prima facie evidence of acts and omissions by [the Clinic] justifying the imposition of a 100% payment hold, and that [the Clinic] failed to rebut such evidence.

(Citations omitted). Janek supported the majority of his alterations by claiming them to be legislative findings which he had "complete discretion" to modify.

### G. Appeal to the District Court

The prior version of Section 531.102 of the Government Code provided for an appeal of the ALJs' decision by "filing a petition for judicial review in a district court in Travis County." *See* Act of May 21, 2013, 83d Leg., R.S., ch. 622, § 2, sec. 531.102(g)(5), 2013 Tex. Gen. Laws 1677, 1678–79 (amended 2015). The Clinic filed its petition for judicial review on July 10, 2014. The statute governing the trial court proceedings provides for the following substantial evidence review:

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the adminis-

trative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

TEX. GOV'T CODE ANN. § 2001.174 (West 2008).

In its petition for review, the Clinic argued that Janek "violated the law and fact-finding process, incorrectly applied the legal standard of demonstrating a 'prima facie' standard of proof, and inappropriately changed standards of policy and applied them retroactively." Specifically, the Clinic claimed that Janek substituted his judgment for the judgment of the ALJs on fact issues by altering several of the ALJs factual findings. To support his changes to some of the findings of fact, Janek stated that the findings addressed mixed questions of law or legislative findings which he had "complete discretion in modifying." The alterations to the findings of fact (FOF) are best reviewed in the chart below:

| FOF No. | ALJs' DECISION | JANEK'S DECISION |
|---|---|---|
| 21 | The claims administrator was responsible for reviewing the filed material to evaluate whether the orthodontic services were medically necessary before granting prior authorization. | Notwithstanding the claims administrator's responsibility for reviewing the filed material to evaluate whether the orthodontic services were medically necessary before granting prior authorization, the Clinic was required to submit accurate HLD score sheets and prior authorization requests substantiating the patient's condition as meeting Medicaid and requirements. |
| 26 | The Clinic was unaware of the 2008 audit report and the HHSC-OIG's assertion that the claims administrator was not properly performing prior authorization evaluations. | The provider agreement required the Clinic and its providers to certify to be truthful, to abide by the Medicaid rules, and to submit true, complete, and accurate information that could be verified by reference to source documentation maintained by the Clinic. |
| 29 | The HLD score sheets for the sixty-three patients were completed by Kanaan and Nazari, and in each case, the patient scored twenty-six or more points. The greatest number of points was associated with the category of "ectopic eruption." | The HLD score sheets for the sixty-three patients in the random sample are completed Kannan and Nazari, and in each case they scored the patient as having a score of twenty-six or more points. The greatest number of points was associated with the category of "ectopic eruption." |
| 39 | The Manuals' definition of ectopic eruption in the 2008–2011 Manual required subjective judgment to interpret. | The Manual requires providers to apply the HLD scoring methodology in accord with their professional training, education, and generally accepted standards in the dental profession. Among those standards is the standard for identifying ectopic eruption. |
| 40 | The Manuals' definition of ectopic eruption was amended, effective January 1, 2012 (2012 Manual), to include the following sentence: Ectopic eruption does not include teeth that are rotated or teeth that are leaning or slanted especially when the enamel-gingival junction is within the long axis of the alveolar ridge. | The Manual's instruction regarding ectopic eruption was amended, effective January 1, 2012 (2012 Manual), to include the following sentence: Ectopic eruption does not include teeth that are rotated or teeth that are leaning or slanted especially when the enamel-gingival vital junction is within the long axis of the alveolar ridge. This amendment clarified existing Texas Medicaid policy regarding conditions qualifying as ectopic eruption and did not substantively change Texas Medicaid policy. |

| FOF No. | ALJs' DECISION | JANEK'S DECISION |
|---|---|---|
| 41 | The language in the Manuals provided a definition of ectopic eruption solely for use in scoring the HLD index to qualify for payment. | The language in the Manuals provide instructions to dentist and orthodontist to score ectopic eruption consistently with the standards for ectopic eruption that are generally recognized in the dental profession. |
| 42 | The Manuals did not address how an orthodontist diagnosed or treated a patient, but only defined ectopic eruption for scoring the HLD score sheet to determine a Texas Medicaid Patient's eligibility for orthodontic treatment. | The Manuals did not address how an orthodontist diagnosed or treated the patient, but only instructed providers to score anterior teeth consistently with the generally understood definition of ectopic eruption in the orthodontic profession. |
| 45 | Tadlock did not apply the Manuals' definition of ectopic eruption in scoring the HLD Index for the sixty-three ADC patients. | In reviewing the sixty-three patient files in the statistically valid random sample, Tadlock applied the definition of ectopic eruption that is generally recognized within the dental profession and scored the patients as instructed by the Manuals. Tadlock properly applied Medicaid policy. |
| 46 | Nazari was a credible witness and properly utilized the Manuals' definition of ectopic eruption in scoring the HLD Index. | Despite SOAH ALJs' finding Nazari's testimony to be credible, Nazari did not properly follow Medicaid policy and his identification of ectopic eruptions; the overwhelming evidence of the consistent pattern of inflated HLD scores submitted by the Clinic establishes reliable, relevant, and material prima facie evidence that the Clinic's misrepresentations of medical necessity constitute willful misrepresentations. |
| 47 | Kanaan was a credible witness and properly utilized the Manuals' definition of ectopic eruption in scoring the HLD Index. | Despite SOAH ALJs' finding Kanaan's testimony to be credible, Kanaan did not properly follow Medicaid policy in his identification of ectopic eruptions; the overwhelming evidence of the consistent pattern of inflated HLD scores submitted by the Clinic establishes reliable, relevant and material prima facie evidence that the Clinic's misrepresentations of medical necessity constitute willful misrepresentations. |

| FOF NO. | ALJS' DECISION | JANEK'S DECISION |
|---|---|---|
| 48 | There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that the Clinic incorrectly scored the HLD Index to obtain Texas Medicaid benefits for patients or to obtain Texas Medicaid payments. | The HHSC-OIG presented evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that the Clinic knowingly incorrectly scored the HLD index on orthodontic prior approval requests submitted to Texas Medicaid. |
| 49 | There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that the Clinic committed fraud or engaged in willful misrepresentation with respect to the sixty-three ADC patients in this case. | The HHSC-OIG presented prima facie evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that the Clinic committed fraud or willful misrepresentations to Texas Medicaid. |
| 50 | There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that the Clinic committed fraud or misrepre-sentation in filing requests for prior authorization with the claims administrator for the sixty-three patients at issue in this case. | The HHSC-OIG presented prima facie evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that the Clinic committed fraud or willful misrepresentations in filing requests for prior authorization with the claims administrator for a substantial majority of patients in the OIG audit sample. |
| 54 | The HHSC-OIG failed to present prima facie evidence that the Clinic billed or caused claims to be submitted to Texas Medicaid for services or items that are not reimbursable by the Texas Medicaid program. | The HHSC-OIG presented prima facie evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that the clinic billed or caused claims to be submitted to Texas Medicaid for services or items that are not reimbursable by the Texas Medicaid program. |
| 55 | Patient 15, 56, and 60, were eligible for interceptive treatment under Texas Medicaid. | The Clinic committed program violations when it submitted prior authorization requests and HLD forms for D8080 comprehensive orthodontic treatment, of Patients 15, 56, and 60 when these patients did not qualify for comprehensive orthodontics. |

| FOF NO. | ALJS' DECISION | JANEK'S DECISION |
|---|---|---|
| 57 | The Clinic's violation is a technical violation and based upon this record, does not rise to a level of substantive concern. | The Clinic's record keeping violations, together with the prima facie evidence presented by the HHSC-OIG of The Clinic's fraud and willful misrepresentations, when analyzed consistently with Texas law and Medicaid policy, justify maintaining the payment hold. |

After reviewing the administrative record, the trial court reversed Janek's final order. The HHSC–OIG argues that the trial court erred in its substantial evidence review.

## II. Standard of Review

"We review the agency's legal conclusions for errors of law and its factual findings for support by substantial evidence." *Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality,* 393 S.W.3d 417, 424 (Tex.App.–Austin 2012, pet. denied). Like the trial court, we are governed by the substantial evidence standard under Section 2001.174 of the Texas Government Code. Thus, the trial court's order is not entitled to deference on appeal. *Id.*

We may not substitute our judgment for the judgment of the state agency on the weight of the evidence, but "shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are ... (A) in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; ...; or (F) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion." TEX. GOV'T CODE ANN. § 2001.174; *see Tex. State Bd. of Med. Exam'rs v. Dunn,* No. 03–03–00180–CV, 2003 WL 22721659, at *2 (Tex.App.–Austin Nov. 20, 2003, no pet.) (mem.op.).

■ In exercising this standard, we analyze whether Janek exceeded his authority to alter the ALJs' findings under former Section 2001.058 of the Government Code. It is the HHSC–OIG's burden to establish that Janek properly changed or disregarded the ALJs' findings and conclusions. *See Heritage on San Gabriel Homeowners Ass'n,* 393 S.W.3d at 424. This is because an agency violates Section 2001.058(e) when the agency substitutes its findings and conclusions for the ALJs' without meeting the statute's requirements. *See Levy v. Tex. State Bd. of Med. Exam'rs,* 966 S.W.2d 813, 815 (Tex.App.–Austin 1998, no pet.).

However, "the test is not whether we believe [Janek] reached the correct conclusion, but whether the agency's factual findings are reasonable 'in light of the evidence from which they were purportedly inferred.'" *Froemming v. Tex. State Bd. of Dental Exam'rs,* 380 S.W.3d 787, 790 (Tex.App.–Austin 2012, no pet.) (quoting *Granek v. Tex. State Bd. of Med. Exam'rs,* 172 S.W.3d 761, 778 (Tex.App.–Austin 2005, no pet.)). Thus, we will sustain Janek's action "if the evidence as a whole is such that reasonable minds could have reached the conclusion that [Janek] must have reached in order to justify [his] action." *See id.* at 790–91 (citing *Tex. State Bd. of Dental Exam'rs v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988)). "We presume that [Janek's] order is supported by substantial evidence, and [the Clinic], as the party appealing the order, has the burden to prove otherwise." *Id.* at 791. "Further, we may not substitute our judgment for that of [Janek's] on the weight of the evidence on matters committed to agency discretion." *Id.*

## III. Analysis

The HHSC–OIG argues that the trial court erred in reversing Janek's order because Janek was authorized to change the ALJs' findings of fact and conclusions of law since the ALJs "did not properly apply or interpret applicable law, agency rules, [or] written policies," and because "a prior administrative decision on which the administrative law judge relied [wa]s incorrect or should be changed." TEX. GOV'T CODE ANN. § 2001.058(e). We disagree with the HHSC–OIG and conclude that the Clinic's substantial rights were prejudiced because Janek's decisions were in violation of Section 2001.058(e) of the Texas Government Code.

The purpose of the SOAH hearings was to determine whether the payment hold could continue. The HHSC–OIG acknowledges that pre-notice payment holds like the one imposed on the Clinic for violations of Section 371.1617 of the Texas Administrative Code have been struck down by the Austin Court of Appeals. Specifically, that court has held that the "HHSC's adoption of rules that permit pre-notice payment holds to be imposed … is inconsistent with the intent of Government Code chapter 532, subchapter C, which is to address and remediate Medicaid fraud and abuse." *Harlingen Family Dentistry, P.C.*, 452 S.W.3d at 486–87. Thus, the HHSC–OIG "confines its arguments to the mandatory prepayment hold under the credible allegation of fraud standard."

In order to continue the hold, the HHSC–OIG bore the burden to make a prima facie showing at the hearing that the evidence relied on by the commission in imposing the hold was "relevant, credible, and material to the issue of fraud or wilful misrepresentation." Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.103, sec. 32.0291(c), 2003 Tex. Gen. Laws 611, 690 (amended 2013). Fraud is an "intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to that person or some other person" Act of June 2, 2003, 78th Leg., R.S., ch. 198, § 2.37A, sec. 531.1011(1), 2003 Tex. Gen. Laws 611, 661 (amended 2015).

Janek was authorized to alter the ALJs' findings if (a) a prior administrative decision on which the ALJs relied was incorrect or should be changed, (b) if the ALJs did not properly apply or interpret applicable law, agency rules, written policies provided by the HHSC–OIG, or prior administrative decisions. Janek's reasons for altering the ALJs' decisions were (1) that the *Harlingen Family Dentistry* case was wrong, (2) that the ALJs misapplied Medicaid policy by determining that the definition of ectopic eruptions was included in the Manual, and (3) that he had complete discretion to alter the factual legislative findings. We address each in turn.

Janek stated that "to the extent that the SOAH ALJs in the instant case relied on" the *Harlingen Family Dentistry* case "in their analysis of this case and of Dr. Evans, they erred." However, the ALJs' finding did not indicate that they relied on the ALJs' conclusions in the *Harlingen Family Dentistry* case to conclude that Evans' report was not credible evidence. Evans' report failed to include the methodology or reasoning for his conclusions. The report also failed to state that his findings supported fraud or knowing misstatements on the Clinic's part. The ALJs determined that Evans' credibility could not be assessed because he did not testify. They further found that "his qualifications to render an opinion upon the scoring of ectopic eruption using the Texas Medicaid HLD score sheet remain unproven." Thus, Janek's factual finding that Evans was credible because the ALJs incorrectly judged his credibility in the *Harlingen Family Dentistry* case did not justify reversing a finding that Evans was not proven to be credible in this case, in light of what was presented to the SOAH ALJs here.[15]

---

15. "In a contested case hearing, the ALJ is the sole judge of witness credibility and is free to accept or reject the testimony of any witness or even accept 'part of the testimony of one witness and disregard the remainder.'" *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778–79 (Tex.App.–Austin 2005, no pet.) (quoting *So. Union Gas Co. v. R.R. Comm'n*, 692 S.W.2d 137, 141–42 (Tex.App.–Austin 1985, writ ref'd n.r.e.)). "We are not permitted to substitute our judgment for the ALJ's regarding the credibility of witnesses."

■ Next, Janek proclaimed that the *Harlingen Family Dentistry* case "incorrectly stated the law, rules, and Medicaid policy and could not be relied on." However, the HHSC had previously adopted all of the ALJs' findings in that case and had argued a position entirely opposite from the one presented in this case. We assume that Janek concluded that the *Harlingen Family Dentistry* case incorrectly determined that the Manuals defined ectopic eruptions, even though the HHSCOIG and its experts relied on the language in the Manual. "An agency is not bound to follow its decisions in contested cases in the same way that a court is bound by precedent." *Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 544 (Tex.App.–Austin 2002, pet. denied).[16] "Courts, however, frequently require that an agency explain its reasoning when it 'appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations.'" *Id.* at 544–45 (quoting *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 900 (Tex.App.–Austin 1993, writ denied)). In front of the SOAH ALJs, the HHSC–OIG offered no reason for changing its position and did not argue that the *Harlingen Family Dentistry* case was wrongly decided.[17] A post-hearing rejection of prior decisions can be considered arbitrary and capricious. *Id.* at 545.

Janek found that the ALJs in this case erred in concluding that the Manuals provided a definition of ectopic eruption and altered several of the ALJs' findings on that basis, including the findings that (1)

Nazari and Kannan were credible witnesses, (2) the Manuals' definition of ectopic eruption required subjective judgment to interpret, and (3) the language in the Manuals was for use in HLD scoring. However, the ALJs' ruling was based on the evidence before them. Evans was the only expert to review the Clinic's files prior to the imposition of the payment hold. He stated that the Manuals provided the definition of ectopic eruption for purposes of the HLD scoring. This is because the Administrative Code provided that "[o]rthodontic services must be prior authorized and are limited to treatment of severe handicapping malocclusion and other related conditions *as described and measured by the procedures and standards published in the [ (Manual) ].*" 25 TEX. ADMIN. CODE § 33.71(a) (Dep't of State Health Servs., Orthodonic Servs. & Prior Authorization) (emphasis added).

In any event, Janek's conclusions (1) that the Manuals merely contained the "instructions" or "standards" for how to score ectopic eruptions and (2) that "[t]he Manuals did, in fact, instruct providers to use their training and education in the treatment of Medicaid patients and to treat those patients in the same manner as other patients," would not alter the outcome of the ALJs' findings. For the sake of argument, we will assume that Janek's statements above were correct.

■ The evidence at the SOAH hearings did not show that Kannan and Nazari ignored the Manuals' "instructions" or "standards" on how to fill out the score sheets or that they discarded their training

---

*Id.* at 779; *see Buddy Gregg Motor Homes, Inc. v. Marathon Coach, Inc.*, 320 S.W.3d 912, 925 (Tex.App.–Austin 2010, no pet.).

16. *Flores* noted, "[W]e have held that when an agency adopts new policy in the course of a contested-case hearing without giving the

parties pre-hearing notice, the parties may be deprived of procedural due process." *Flores*, 74 S.W.3d at 455.

17. The HHSC–OIG merely argued that collateral estoppel and res judicata did not apply.

and education in diagnosing and treating patients. In fact, Tadlock ignored the Manuals' instructions on how to score ectopic eruptions, contrary to the mandate of Title 25, Section 33.71 of the Texas Administration Code. 25 TEX. ADMIN. CODE § 33.71(a) (Dep't of State Health Servs., Orthodonic Servs. & Prior Authorization). Kannan, Nazari, and Tadlock all agreed that there were differences between Medicaid rules for HLD scoring and what ectopic eruption was in orthodontic practice. The HHSC–OIG introduced an article which specifically stated that the HLD Index was designed to "attempt to obtain a method which will complement and perhaps substitute for clinical judgment which, although useful to a degree, is vulnerable because it is entirely subjective." The HLD Index was a tool used to determine whether severe handicapping was present, a concept which the article said "require[d] further elucidation." The Manuals' language instructed dentists to score unusual patterns of eruption for each tooth, without further specification. The example of ectopic eruption provided by the Manuals did not match the textbook definition of ectopic eruption in practice.

In essence, Janek determined that Kannan and Nazari fraudulently entered HLD scores by following only the "instructions" or "standards" provided by the Manuals. Yet, the ALJs heard that Evans' report was the authority that prompted the HHSC–OIG's payment hold. Evans' report specifically stated that he entered HLD scores on the sixty-three patient files he reviewed "by using the [Manual] definition." Using the same definition as the one used by Nazari and Kannan, Evans determined that none of the patients "met the required 26 points to qualify for orthodontic treatment." This discrepancy contributed to the ALJs' finding that the Manuals' language allowed for subjective results. Likewise, evidence at the SOAH hearings suggested that clinical interpretations are also subjective.[18]

In light of Title 25, Section 33.71(a) of the Texas Administration Code and the evidence presented at the SOAH hearings, we find that Janek's conclusion that the ALJs misapplied or misinterpreted applicable law, agency rules, written policies provided by the HSSC–OIG, or prior administrative decisions with respect to ectopic eruptions was unreasonable.[19] *See*

18. The HHSC–OIG cites to *Akin v. State Board of Dental Examiners* to support the idea that if statutory language or an administrative rule is ambiguous, we defer to an administrative agency's construction unless it is plainly erroneous or contradicts the text of the rule or underlying statute. *Akin v. State Bd. of Dental Exam'rs*, No. 03–14–00390–CV, 2015 WL 1611803, at *3 (Tex.App.–Austin Apr. 9, 2015, no pet.) (mem.op.). It argues that Janek's order supports the idea that ectopic eruption is a term of art. Yet, Janek's opinion states that the phrase ectopic eruption should be given its plain meaning. In doing so, he cited to pages in Altenhoff's testimony where she testified that the phrase "grossly out of the long axis" is not defined and the term ectopic eruption is explained by the manual. Janek's citations do not support the reversal of the ALJs' findings that the Manuals' terms could lead to different results. To the extent

that the HHSC–OIG argues that the term is a term of art, the evidence presented at the hearing demonstrated that the term of art is subject to different interpretations. In any case, "deference to the agency's interpretation is not conclusive or unlimited—we defer only to the extent that the agency's interpretation is reasonable." *Heritage on Gabriel Homeowners Ass'n*, 393 S.W.3d at 424 (citing *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011)).

19. Janek also altered the ALJs' findings based on his conclusion that

[t]he Inspector General based his payment hold, in part, on [the Clinic's] failure to provide records pursuant to the Inspector General's request. In some cases, [the Clinic] had these records, and entered them into evidence in this case *over a year after*

25 TEX. ADMIN. CODE § 33.71(a) (Dep't of State Health Servs., Orthodonic Servs. & Prior Authorization).

Next, almost all of Janek's alterations to the ALJs' findings relied on the position that the ALJs' findings were legislative findings. The Austin court stated in *Dunn*,

> An ALJ, as an independent and impartial fact-finder, is better suited to decide questions of so-called "adjudicative fact," meaning questions of fact affecting only the parties to a contested case, "the 'who, what, when, where and how' disputes of the case." On the other hand, agencies are "relatively" free to review and correct an ALJ's "legislative facts," which "provide a foundation for developing law, rules, or policies and, consequently, affect the outcome of many cases." [F. Scott McCown & Monica Leo, *When Can an Agency Change the Findings or Conclusions of an Administrative Law Judge?* 50 BAYLOR L.REV. 65, 68–69 (1999)] (citing K.C. Davis, *Treatise on Administrative Law* § 15.03, at 353 (2d ed. 1979)); *see Exxon Corp. v. [R.R.] Comm'n*, 993 S.W.2d 704, 710 (Tex.App.–Austin 1999, no pet.)

*Dunn*, 2003 WL 22721659, at *3. Following *Dunn*, the Austin court has written that "[a]n ALJ[']s findings of fact, even adjudicative facts, are not completely insulated from review by the Board. While it is not the Board's function to reweigh the evidence and change adjudicative facts after a hearing before an ALJ, the Board may change adjudicative facts if they are improper under [administrative rules]." *Larimore v. Employees Ret. Sys. of Tex.*, 208 S.W.3d 511, 516 (Tex.App.–Austin 2006, pet. denied).

"The resolution of adjudicative facts often requires making credibility determinations." *Flores*, 74 S.W.3d at 539. "The hearing examiner is better suited to make such determinations than is an agency head or board reviewing the hearing examiner's proposed decision because the hearing examiner has heard the evidence and has observed the demeanor of the witnesses." *Id.* "In addition, a hearing examiner who is an ALJ with the State Office of Administrative Hearings (SOAH) and not employed by the agency is a 'disinterested hearings officer.'" *Id.* (quoting F. Scott McCown & Monica Leo, *When Can an Agency Change the Findings or Conclusions of an Administrative Law Judge?*, 50 BAYLOR L.REV. 65, 74 (1999)). "Given that the resolution of disputed adjudicative facts requires weighing the evidence and making credibility determinations, a neutral decision-maker is crucial to a fair adjudicatory hearing." *Id.* at 540. We have explained why Janek's conclusions that the ALJs' misinterpreted or misapplied Medicaid policy was unreasonable. To the extent Janek relied on these conclusions to reweigh the ALJs' credibility determinations, a matter that is not committed to agency discretion, we find such act was prohibited by former Section 2001.058 of the Texas Government Code.

Here, the HHSC–OIG admits that it was required to make a prima facie case that it had evidence of fraud or willful misconduct. It argues that it met that burden by providing the Clinic's HLD scores and Tadlock's testimony. Janek also concluded that the HHSC–OIG presented evidence that the Clinic "knowingly incorrectly

---

the Inspector General requested them. [The Clinic's] failure to provide these records immediately is a program violation. . . .
Janek made other changes by referring to program violations, which were struck down by the district court. Because Janek's reliance on program violations to support the payment hold was misguided, the conclusions derived from such reliance were also incorrect.

scored the HLD index" based on Tadlock's testimony. However, the HHSC–OIG had not retained Tadlock when it sent notice of the payment hold. Instead, it relied on Evans' report at that time. Because Evans did not testify, the ALJs determined that his credibility could not be assessed. Nothing suggested that Evans believed that the Clinic's HLD scores were the result of fraud or wilful misrepresentation, including his conclusory report.

■ The "right to possess funds pursuant to a payment hold for fraud depends solely on the existence of credible evidence of such fraud. In the absence of such evidence, 'the State's right to temporary possession of the funds no longer exist[s].'" *Harlingen Family Dentistry, P.C.,* 452 S.W.3d at 488 (quoting *Janek,* 451 S.W.3d at 103). We conclude that reasonable minds could not have reached Janek's conclusion that the HHSC–OIG met its burden to demonstrate that it had relevant, credible, material evidence of fraud or willful misrepresentation at the time it sent its payment hold notice to the Clinic based on Tadlock's opinions.

Because many of Janek's changes to the ALJs' findings were not authorized by Section 2001.058 of the Texas Government Code, we find that the trial court properly conducted the substantial evidence review. Accordingly, we overrule the HHSC–OIG's point of error.

## IV. Conclusion

We affirm the trial court's judgment.