# IN THE SUPREME COURT OF TEXAS

No. 16-0549

DR. BEHZAD NAZARI, D.D.S., ET AL., PETITIONERS,

v.

THE STATE OF TEXAS; XEROX CORPORATION; AND XEROX STATE HEALTHCARE,
LLC F/K/A ACS STATE HEALTHCARE, LLC, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

JUSTICE LEHRMANN, joined by JUSTICE JOHNSON, concurring in part and dissenting in part.

When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and equity, and a judgment for or against her must be given the same effect as would have been given it had it been rendered in a case between private individuals.[1]

Over a decade ago, we considered "whether sovereign immunity continues to exist when an affirmative claim for relief is filed by a governmental entity." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 376 (Tex. 2006). We determined that "under such circumstances immunity from suit no longer completely exists for the governmental entity." *Id.* (citing *State v. Humble Oil & Ref. Co.*, 169 S.W.2d 707, 708 (Tex. 1943)). This is because our modern jurisprudence rejects the "antiquated 'feudal fiction'" that the government can do no wrong.

---

[1] *State v. Cloudt*, 84 S.W. 415, 416 (Tex. Civ. App. 1904, writ ref'd).

*Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (quoting *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003)). Rather, "modern-day justifications" for immunity "revolve around protecting the public treasury." *Id.* Consistent with these policies, we have narrowed the doctrine's scope in circumstances where "the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief," *Reata*, 197 S.W.3d at 376, because it would be "fundamentally unfair to allow [a governmental entity] to assert affirmative claims against [a] party while claiming immunity" as to the party's claims against it, *City of Dallas v. Albert*, 354 S.W.3d 368, 379 (Tex. 2011).

In this case, the State filed suit under the Texas Medicaid Fraud Prevention Act (Medicaid Fraud Act or Act), alleging that the defendants, several dental providers offering services through the Texas Medicaid program, fraudulently obtained Medicaid reimbursements. In filing suit, the State sought to recover any payments unlawfully provided under the Medicaid program; prejudgment interest; two times the amount of any payment provided under the Medicaid program; civil penalties; and expenses, costs, and attorney's fees, as provided by the Act's "civil remedies" provision. *See* TEX. HUM. RES. CODE § 36.052(a). The Providers counterclaimed for breach of contract, conversion, and fraud. The issue before the Court is whether sovereign immunity bars the Providers' counterclaims. Because the State seeks "monetary relief" under *Reata*, I would hold that the State's decision to file this action "encompassed a decision to leave its sphere of immunity from suit." *Reata*, 197 S.W.3d at 377. Because the Court holds otherwise, I must respectfully express my dissent.[2]

---

[2] For the reasons the Court explains, I agree that we lack interlocutory jurisdiction to address the dismissal of the Providers' third-party claims.

2

## I. Background

In 1993, the mothers of children in low-income families sued the Texas Department of Health and the Texas Health and Human Services Commission under 42 U.S.C. § 1983, alleging that the Texas Medicaid program did not comply with federal law.[3]  The plaintiffs, a class of more than 1.5 million indigent children in Texas, claimed that "the Texas program did not ensure eligible children would receive health, dental, vision, and hearing screens," "failed to meet annual participation goals," and "lacked proper case management and corrective procedures."[4]  The State ultimately agreed to settle the dispute by entering into a consent decree, which required the State, among other things, "to conduct outreach efforts aimed at increasing participation and the receipt of needed services" for Medicaid-eligible children.[5]  After years of litigation, in 2007 the State began allocating millions of dollars in state and federal funding to provide these increased services, including Medicaid dental services.[6]

However well-intended, these efforts attracted the scrutiny of Texas news media, and a Dallas news station reported a series of stories highlighting the State's high expenditures for dental and orthodontic services.[7]  The Health and Human Services Commission, through its Office of Inspector General, subsequently attributed the high expenditures to dental fraud.  The Commission imposed payment holds against various dental providers, including some of the Providers in this

---

[3] *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 434 (2004).

[4] *Frew v. Gilbert*, 109 F. Supp. 2d 579, 587 (E.D. Tex. 2000), *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002), *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004).

[5] *Id.* at 588–89.

[6] *See* Act of May 25, 2007, 80th Leg., R.S., ch. 1429, § 19, 2007 Tex. Gen. Laws 5834, 5838–39.

[7] *See, e.g.*, Byron Harris, *Crooked Teeth: Medicaid Millions*, WFAA (Jan. 9, 2012 1:10 PM CST), http://www.wfaa.com/news/local/investigates/crooked-teeth-medicaid-millions_20161017055833341/336726628.

case.[8]  Following administrative hearings,[9] the SOAH administrative law judges found that the State had failed to present prima facie evidence to support its fraud allegations and ruled that the payment holds should be reversed.[10]  But the Commission refused to release the funds, in one case "alter[ing] the ALJs' findings of fact and conclusions of law and issu[ing] a final order sustaining the HHSC-OIG's payment hold."[11]

The Providers filed suit, challenging the Commissioner's authority to continue holding the funds.[12]  The trial courts agreed with the Providers, in one case reversing the final order sustaining the payment hold and, in another, issuing a writ of mandamus commanding the State to pay the improperly held funds.[13]  The courts of appeals affirmed the trial courts' judgments in the payment-hold proceedings, ordering the State to release the held funds.[14]  The State nonsuited the administrative cases and did not release the withheld funds to the Providers.

---

[8] *See Tex. Health & Human Servs. Comm'n v. Antoine Dental Ctr.*, 487 S.W.3d 776, 777–78 (Tex. App.— Texarkana 2016, no pet.); *Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97, 99 (Tex. App.—Austin 2014, pet. denied).

[9] A provider subject to a payment hold, which the Commission may impose without prior notice on a provider's Medicaid reimbursements upon a credible allegation of provider fraud, may request an expedited administrative hearing before the State Office of Administrative Hearings. *Shamrock Psychiatric Clinic, P.A. v. Tex. Dep't of Health & Human Servs.*, 540 S.W.3d 553, 555 (Tex. 2018) (citing TEX. GOV'T CODE § 531.102(g)(2), (3)).

[10] *Antoine Dental Ctr.*, 487 S.W.3d at 778, 789; *Harlingen Family Dentistry*, 451 S.W.3d at 102.

[11] *Antoine Dental Ctr.*, 487 S.W.3d at 778, 791 ("Subsequently, [the HHSC Executive Commissioner] entered a final order on May 2, 2014, which also rejected the ALJs' decision.  The order was presumably made under authority of Section 357.483 of the Texas Administrative Code, which states, 'The judge is a designee of the HHSC Executive Commissioner for purposes of: (1) issuing default, final, and other orders, and (2) ruling on any motions for rehearing.'").

[12] *Id.* at 778; *Harlingen Family Dentistry*, 451 S.W.3d at 99.

[13] *Harlingen Family Dentistry*, 451 S.W.3d at 104; *Antoine Dental Ctr.*, 487 S.W.3d at 802.

[14] *Harlingen Family Dentistry*, 451 S.W.3d at 104 ("There is no evidence that is credible, reliable, or verifying, or that has indicia of reliability, that [the providers] committed fraud or misrepresentation."); *Antoine Dental Ctr.*, 487 S.W.3d at 804.

The State filed the instant suit under the Medicaid Fraud Act, pursuing the same allegations at issue in the nonsuited administrative cases.[15] The Providers responded with counterclaims for "proportional recovery of actual and exemplary damages, interest, court costs, and attorney fees against the State" for conspiracy and breach of contract, in addition to a demand that the State release the monies held as ordered by the administrative law judges, trial courts, and courts of appeals in the nonsuited administrative proceedings. The State invoked sovereign immunity in a plea to the jurisdiction.

The trial court granted the State's plea without stating its reasons. The court of appeals affirmed, holding that the *Reata* rule did not apply because (1) "the civil penalties that the State is seeking against the Dental Groups do not qualify as damages or monetary relief as those terms were used in *Reata*," and (2) "when the State pursues an enforcement action under the [Medicaid Fraud Act], it is not acting as an ordinary or private litigant as described in *Reata* but is instead acting in its sovereign capacity and exercising its police powers." 497 S.W.3d 169, 181 (Tex. App.—Austin 2016) (emphasis removed).

## II. Analysis

The Providers contend that this case fits perfectly within our *Reata* holding: because the State asserted affirmative claims for monetary relief against the Providers, it does not have immunity against the Providers' offsetting counterclaims, which are connected, germane, and properly defensive to the State's claims. The State disagrees, arguing that in this Medicaid fraud

---

[15] The State also filed a separate suit against Xerox Corporation, the private contractor charged with administering the Texas Medicaid program and assessing the medical necessity of providers' reimbursement claims, for violations of the Medicaid Fraud Act. *See State v. Xerox Corp.*, No. D-1-GV-14-000581 (53rd Dist. Ct., Travis County, Tex. May 9, 2014).

5

(or any other) enforcement action, (1) the State does not seek the type of "monetary relief" we addressed in *Reata*, (2) the State does not appear as an "ordinary litigant," and (3) the defendants' counterclaims are not and cannot be connected, germane, and properly defensive to the State's claims. The Court sides with the State, holding that "the *Reata* rule . . . *never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty." *Ante* at ___. And, relying on our decision today in *In re Xerox*, ___ S.W.3d ___ (Tex. 2018), the Court holds that because the Medicaid Fraud Act "employs a penalty scheme," the Act's civil remedies provision constitutes a monetary penalty and thus may not be offset. *Ante* at ___. I find the Court's analysis unpersuasive.

## A. Judicial Abrogation of Immunity

In analyzing the reach of sovereign immunity, we must engage in a careful weighing analysis and consider the policy issues at hand. *See, e.g.*, *Olivares*, 461 S.W.3d at 123 ("Guiding our analysis of whether to extend sovereign immunity . . . is whether doing so comports with and furthers the legitimate purposes that justify this otherwise harsh doctrine."). These policy considerations led us to permit offsetting counterclaims against the government because: "(1) 'when the State sues a private party, the general public stands to lose nothing'; (2) doing so avoids 'jurisdictional problems in asking courts to enforce a judgment against a government entity'; and (3) allowing such [claims] promotes 'fundamental fairness.'" *C. Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth. of Comanche Cty.*, 540 S.W.3d 548, 552 (Tex. 2018) (quoting *City of Galveston v. State*, 217 S.W.3d 466, 472 (Tex. 2007)). Properly applying these principles, I would hold that *Reata*, its predecessors, and its progeny dictate that the State's claims under the Medicaid Fraud Act constitute affirmative claims for monetary relief; the Providers' counterclaims

6

are germane, connected, and defensive to those claims; and allowing the Providers to offset the State's recovery with their counterclaims comports with the policies underlying immunity.

## B. *Reata*'s Scope

In *Reata*, the City of Dallas intervened in a pending tort action and asserted claims that the city's contractor and its subcontractor negligently caused the city damages when the subcontractor accidentally drilled through a water main. 197 S.W.3d at 373. The State distinguishes *Reata*, noting that, in this case, the State is not seeking compensatory damages under a conventional tort theory. Instead, the State contends, although this is a civil case, it is a "law-enforcement action" seeking statutory "sanctions" or "penalties," or perhaps "liquidated damages" (as opposed to compensatory damages), which are not based or calculated on the amount of damages or losses the State suffered as a result of the Providers' fraud.

The court of appeals agreed, concluding that the State sued for a "civil penalty" to "punish" the Providers for violating a public-welfare statute and to deter others from doing the same. 497 S.W.3d at 179. The court of appeals primarily relied on *State v. Emeritus Corp.*, 466 S.W.3d 233 (Tex. App.—Corpus Christi 2015, pet. denied), in which the court held that the Texas Medical Liability Act did not apply to the State's enforcement action against a healthcare provider because the State was acting "in its sovereign capacity and us[ing] its police powers to impose and recover a civil penalty," rather than as a "claimant" seeking "damages." 497 S.W.3d at 179–80. The court of appeals here concluded that "the civil penalties that the State is seeking against the Dental Groups do not qualify as *damages* or *monetary relief* as those terms were used in *Reata*." *Id.* at 181.

7

The Providers argue that the court of appeals erred in that conclusion because, other than its claim for an injunction, all of the State's claims in this suit are for "monetary relief." Specifically, the Medicaid Fraud Act authorizes, and the State requests in its pleadings, a monetary award including (1) the "amount of any payment" the State made "as a result of" each "unlawful act"; (2) prejudgment interest on that amount; (3) a "civil penalty" for each unlawful act; and (4) two times "the amount of any payment" made as a result of an unlawful act. *See* TEX. HUM. RES. CODE § 36.052(a). The Providers argue that, although *Reata* happened to involve tort claims for compensatory damages, our holding was not limited to those types of claims seeking that type of monetary relief. The court of appeals thus created a "distinction that *Reata* neither contemplates nor supports."

I agree with the Providers. The Court superficially states that "*Reata* uses the word 'damages' more than a dozen times," concluding that "[t]his usage indicates that we decided the case based on the narrow theory of damages rather than the broad theory of a transfer of funds." *Ante* at ___. Admittedly, a word search for the term "damages" reveals that we used the word thirteen times throughout the opinion, but the majority of the references are not relevant to the issue before us.[16] As relevant to the Court's analysis, we referred to the City's claim for "damages" four times in *Reata*, noting that the City had sued for damages and reasoning that the City's

___

[16] For example, two of the references appear in a discussion of the United States Supreme Court's sovereign immunity jurisprudence. *Reata*, 197 S.W.3d at 375 ("The United States Supreme Court has also recognized that suits for money damages against states 'may threaten the financial integrity of the States' and that 'at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages.'" (quoting *Alden v. Maine*, 527 U.S. 706, 750 (1999))). One reference is contained in a recitation of our often-repeated principle that "[s]overeign immunity protects the State from lawsuits for money damages." *Id.* at 374. Similarly, two references describe the relief sought by the private party, not the State. *Id.* at 377 ("Absent the Legislature's waiver of the City's immunity from suit, however, the trial court did not acquire jurisdiction over [the defendants'] claim for damages against the City in excess of damages sufficient to offset the City's recovery, if any."). And four of the references appear under the Court's analysis of waiver of immunity under the Texas Tort Claims Act, which is wholly separate from the abrogation issue. *Id.* at 377–78.

8

decision "to file suit for damages encompassed a decision to leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to claims the City asserts"; that sovereign immunity did not apply to the subcontractor's counterclaims "made against the City which were connected to, germane to, and properly defensive to the matters on which the City based its claim for damages"; and that "the City's assertion of claims for damages against Reata means that the City does not have immunity from Reata's claims to the limited extent we have explained." 197 S.W.3d at 377. We referred once to "monetary damages," reasoning that, "if the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." *Id.* at 375.

But our discussion and our holding in *Reata* utilized much broader terms. Addressing not just the City's claims but the principles underlying our holding, we referred twice to claims for "monetary relief." First, we reasoned that "where the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief, we see no ill befalling the governmental entity or hampering of its governmental functions by allowing adverse parties to assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the governmental entity." *Id.* at 376–77. Second, we held that because "the City asserted affirmative claims for monetary relief against Reata, the City does not have immunity from Reata's claims germane to, connected to, and properly defensive to claims asserted by the City, to the extent any recovery on those claims will offset any recovery by the City from Reata." *Id.* at 378. We referred once to "monetary recovery," explaining that, once the government "asserts affirmative claims for monetary recovery, the City must participate in the litigation process as an

9

ordinary litigant." *Id.* at 377. And, most broadly, we referred three times simply to the government's "recovery." We reasoned that our holding would not disrupt the government's fiscal planning if "the opposing party's claims can operate only as an offset to reduce the government's recovery." *Id.* at 375. We further held that immunity would still preclude jurisdiction over any counterclaim "for damages against the City in excess of damages sufficient to offset the City's recovery." *Id.* at 377. Finally, we concluded that the City did not have immunity "to the extent any recovery on [the counterclaims] will offset any recovery by the City from Reata." *Id.* at 378.

We have since characterized *Reata*'s holding by using the broader terms, explaining that governmental entities "do not have immunity from offsetting claims germane to, connected to, and properly defensive to *monetary claims* by the entities." *Albert*, 354 S.W.3d at 376 (emphasis added).[17] And more recently, we described *Reata* as holding that "when a governmental entity asserts claims for *monetary relief*, immunity does not protect the entity against the defendant's counterclaims for monetary relief that are 'germane to, connected with, and properly defensive to' the government's claims." *Borunda*, 540 S.W.3d at 549–50 (emphasis added) (quoting *Reata*, 197 S.W.3d at 376–77). In both of these cases, we described *Reata*'s holding as broadly addressing the State's claims for monetary "recovery."

Accordingly, I agree with the Providers that the language we used in *Reata* did not limit our analysis or our holding to government claims for "compensatory damages," but instead rested more broadly on the government's claims seeking a "monetary recovery." However, as the Court

---

[17] *See also City of Dallas v. Martin*, 361 S.W.3d 560, 561 n.4 (Tex. 2011) ("In *Reata* we held that a governmental entity does not have immunity from monetary claims against it that are 'germane to, connected with, and properly defensive to' affirmative claims made by the entity, to the extent the claims against the entity offset the entity's claims."); *City of Irving v. Inform Constr., Inc.*, 201 S.W.3d 693, 694 (Tex. 2007) ("As we explained in *Reata*, however, the City retains immunity from suit . . . to the extent Inform's damages exceed amounts offsetting the City's monetary recovery.").

10

observes, *Reata* involved only claims for compensatory damages, and neither *Reata* nor any of our subsequent cases specifically address the distinction between the broader and narrower terms. In other words, this is an issue of first impression, and it may just be, as the State and the Court suggest, that we used the broader terms merely as convenient references to the compensatory-damage relief the government was seeking in those cases, rather than to limit the State's immunity when it seeks any form of monetary recovery. I would reject that suggestion, however, primarily for two reasons.

First, although *Reata* involved only claims for compensatory damages, the cases on which we relied to support our holding in *Reata* did not. *Anderson, Clayton & Co. v. State*, the case that provided the foundation for our *Reata* holding, was an enforcement action in which the State sought "recovery of penalties" against a trucking company operating without a license. 62 S.W.2d 107, 107 (Tex. 1933). We held that the defendant could maintain a counterclaim against the State in that case, reasoning that the State,

> having invoked the jurisdiction of the district court . . . for a judicial determination of the question as to whether the defendants were subject to the provisions of the foregoing act and liable for *the penalties* described therein, it became subject to the same rules as other litigants, except in so far as such rules may be modified in favor of the state by statute or may be inapplicable or unenforceable because of exemptions inherent in sovereignty. . . . That court at the instance of the state acquired jurisdiction of the parties and subject-matter in controversy, and, the defendants having sought affirmative relief in a cross-bill, the jurisdiction of the court cannot afterwards be defeated by the state upon a plea that the cross-petitioners were seeking an injunction against the enforcement of a penal statute.

*Id.* at 110 (emphasis added). The Court attempts to limit *Anderson, Clayton*, reasoning that although the State sought "recovery of penalties," the defendants sought only an injunction, not money damages, in their counterclaim. *Ante* at ___. But the Court gives short shrift to our

11

language in that case. In determining that sovereign immunity did not bar the defendants'

counterclaims, we identified two guiding rules:

> The authorities sustain the exception to the foregoing rule that the state's immunity from suit does not extend to a suit against state officers to enjoin the enforcement of an invalid law to the injury of the legal rights of a citizen.

> But the authorities sustain the *further rule* that, where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove *all matters* properly defensive. This includes the right to make *any defense* by answer or cross-complaint germane to the matter in controversy.

*Anderson, Clayton & Co.*, 62 S.W.2d at 110 (citations omitted) (emphases added). Dismissing the

"rule" that a defendant is entitled to plead and prove *all matters* properly defensive, the Court

concludes that the decision "establishes little" in resolving this case. *Ante* at ___. In addition to

sidestepping that language, the Court ignores the fact that in *Anderson, Clayton* we expressly

rejected the argument that the State's immunity could hinge on the "penal" nature of the statute

being enforced, 62 S.W.2d at 108, a justification the Court relies on today. Further, the Court's

reliance on the nature of the relief requested in the *counterclaims* is novel and misplaced. So long

as the counterclaims are germane, connected, and properly defensive to the government's claims

and do not seek more than is required to offset those claims, they are permitted under *Reata*. 197

S.W.3d at 377.

In *Reata*, we also relied on our decision in *Humble Oil*, which involved the State's action

to recover unpaid production taxes "plus interest and *penalties*." 169 S.W.2d at 708 (emphasis

added). We held in *Humble Oil* that the defendant could not assert offsetting counterclaims based

on alleged overpayments in other tax periods. *Id.* at 710. However, contrary to the Court's

description, we did not base that holding on the nature of the State's affirmative claims. Rather,

12

*Humble Oil*'s result rested on the fact that the defendant's counterclaims involved taxes due for different months and years than the taxes on which the State had sued, and thus the counterclaims were not "dependent upon" or "connected with" the State's affirmative claims. *Id.* Moreover, we affirmed that we had "no fault to find with the rule of law announced in the *Anderson, Clayton & Co.* opinion, when applied in a proper case." *Id.* at 709. Because we based our decision in *Reata* on these seminal cases, it is no surprise that we referred broadly to government claims for "monetary relief" and "monetary recovery" in *Reata*, even though *Reata* itself involved only claims for compensatory damages.

Consistent with my reading of *Reata*'s scope, several courts of appeals have applied *Reata* in cases involving government claims for monetary relief other than compensatory damages, including penalties, yet the Court neither cites, discusses, nor overrules those cases. For example, in *Bandera County v. Hollingsworth*, the San Antonio Court of Appeals held the County was not immune from a counterclaim for breach of a Rule 11 agreement where the underlying suit involved the State's claim for "taxes due, together with interest, penalties, costs, expenses, and attorney's fees." 419 S.W.3d 639, 642–44 (Tex. App.—San Antonio 2013, no pet.). Similarly, in *Redburn v. Garrett*, the City brought, among other claims, "an enforcement action for statutory penalties in the amount of $5,000 per day pursuant to Chapter 54 of the Texas Local Government Code." No. 13-12-00215-CV, 2013 WL 2149699, at *2 (Tex. App.—Corpus Christi, May 16, 2013, pet. denied) (mem. op.). Despite the inclusion of penalties in the monetary relief sought, the Corpus Christi Court of Appeals applied *Reata*, holding that the City did "not have immunity from suit for claims germane to, connected with, and properly defensive to its [cross-claims] to the extent [appellant's] claims act as an offset against the City's recovery." *Id.* at *10 (quoting *Inform*

13

*Constr.*, 201 S.W.3d at 694). And in *City of Conroe v. TPProperty LLC*, the city sought judgment against the defendant for "unpaid taxes, and statutory penalties, attorneys' fees, and court costs." 480 S.W.3d 545, 564 (Tex. App.—Beaumont 2015, no pet.). Without distinguishing between any of these forms of monetary recovery, the Beaumont Court of Appeals compared the city's and the defendant's claims, concluding that they "arise from the same transactions" and "rely on the trial court's resolution of similar disputed facts." *Id.* Accordingly, the Court held that the city was not immune to the extent the defendant's "claims act as offsets to the City's [claims]." *Id.* (citing *Reata*, 197 S.W.3d at 376–77). As these cases illustrate, nothing in the language of *Reata*, its predecessors, or its progeny indicates that the *Reata* rule applies only when the government seeks to recover "damages" or "compensatory damages."

In addition to the absence of language in *Reata* and its predecessors indicating that the type of monetary recovery sought informs the offset analysis, the policies underlying the sovereign-immunity doctrine do not support the limitation the Court adopts. Consistent with our holdings in *Anderson, Clayton* and other earlier cases, we explained in *Reata* that our "determination that a governmental entity's immunity from suit does not extend to a situation where the entity has filed suit is consistent with the policy issues involved with immunity." 197 S.W.3d at 375. And "the primary concern in *Reata* was ensuring that any outcome in favor of a counterclaiming defendant would not be paid with taxpayer dollars." *Borunda*, 540 S.W.3d at 552. That is because the purpose of sovereign immunity is to "shield the public from the costs and consequences of improvident actions of their governments." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006)); *see also Olivares*, 461 S.W.3d at 123 (considering "the general purpose of protecting the public fisc"). We thus limited the scope

of immunity when the government files claims for monetary relief because, "if the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." *Reata*, 197 S.W.3d at 375. And if "the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted." *Id.*

Accordingly, the policy reasons behind our decision in *Reata* support the broad language we used in that case, as well as the conclusion that *Reata*'s holding applies when the government chooses to file a claim for "monetary relief" or "monetary recovery," not just for "damages" or "compensatory damages," as the State suggests. And here, the State is undeniably seeking monetary relief. In this circumstance, as in *Reata*, "the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief." *Id.* at 376–77. I therefore "see no ill befalling the governmental entity or hampering of its governmental functions" in this case by allowing the Providers to assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the State. *Id.*

Moreover, it is fundamentally unfair to allow the State to assert affirmative claims against the Providers—claims that could result in millions of dollars of recovery—but deny the Providers an opportunity to merely offset that recovery with counterclaims seeking, at a minimum, the release of money that every court to adjudicate the merits of the case has held to be unlawfully retained by the government. *See Borunda*, 540 S.W.3d at 553 (citing *Reata*, 197 S.W.3d at 375–76 ("[I]t would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it."), and *Albert*,

15

354 S.W.3d at 380 (noting that "here we do not see any fundamental unfairness or inequity occurring")). The State has undoubtedly taken advantage of its sovereignty, unsuccessfully pursuing its fraud claims through several tribunals, modifying findings and orders in support of its position, and then, faced with court orders to release the withheld funds, abandoning its claims only to reappear here and assert immunity. I would hold that the State's pursuit of monetary relief under the Medicaid Fraud Act subjected it to the jurisdiction of the Court for offsetting, related counterclaims. "To hold otherwise would permit [the State] to use the court in the attainment of [its] object by piecemeal, by first adopting its judgment as right, and then repudiating it as wrong, and to avail [it]self of the advantages of its being both right and wrong." *See Sec. Trust. Co. of Austin v. Lipscomb County*, 180 S.W.2d 151, 158 (Tex. 1944) (citation and internal quotation marks omitted).

### C. The Court's "Law-Enforcement" Exception

The Court ignores the policy and jurisprudential concerns discussed herein, concluding instead that "sovereignty itself remains an important justification for sovereign immunity." *Ante* at ___. But as we have already explained, protecting the public fisc and public reliance on government services, not fealty to an all-powerful sovereign, underlie our modern justifications for maintaining the doctrine. *Olivares*, 461 S.W.3d at 121. Regardless, the Court adopts the State's view that *Reata* does not apply here because the State is acting in its sovereign "law-enforcement" capacity. According to the Court, *Reata* "*never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty." *Ante* at ___. Because "[p]enalties serve a law-enforcement function," the Court asserts,

16

allowing "spurious counterclaims" would "severely undermine their effectiveness" and "would interfere with the state's ability to enforce its laws." *Id.* at ___.[18]

The Court's law-enforcement rationale is unfounded. First, the State highlights that, when it acts in a law-enforcement capacity, it necessarily is not acting as an "ordinary litigant" as *Reata* requires. But the State's argument mischaracterizes our description of the government as an "ordinary litigant" in *Reata*. We used the term in explaining that once the government "asserts affirmative claims for monetary recovery, [it] must participate in the litigation process as an ordinary litigant, save for the limitation that [it] continues to have immunity from affirmative damage claims against it for monetary relief exceeding amounts necessary to offset [its] claims." *Reata*, 197 S.W.3d at 377. We did not hold that the *Reata* rule applies *only if* the government is participating in litigation as an "ordinary litigant"; rather, we held that *when* the *Reata* rule applies the government must *participate as* an "ordinary litigant." *Id.* This is consistent with the well-recognized principle that our procedural and evidentiary rules apply to the State as they would to any other litigant when it appears in court. *See State v. Naylor*, 466 S.W.3d 783, 792 (Tex. 2015) ("[W]here the Legislature has given no indication to the contrary the State must abide by the same rules to which private litigants are beholden."). These references to the State as an "ordinary litigant" do not address the sovereign-immunity question of whether the State may be required to appear in court. Nothing in *Reata*'s text or reasoning limits its application to cases in which the State appears as an "ordinary litigant," as opposed to "enforcement actions." *See Reata*, 197 S.W.3d at 376 (discussing *Kinnear v. Tex. Comm'n on Human Rights*, 14 S.W.3d 299, 300 (Tex.

---

[18] The Court's reference to "spurious counterclaims" is curious, as it implies a connection between a claim's merits and the government's immunity. Whether the government is immune from suit has nothing to do with the strength or weakness of the claims asserted against it.

17

2000) (holding that the State was not immune from a counterclaim for attorney's fees in an enforcement action under the Texas Fair Housing Act)).

Second, a law-enforcement exception would swallow the *Reata* rule. The Court gives little guidance on how to determine whether the State is acting in a "law-enforcement" capacity as opposed to an "ordinary litigant," other than to state that the exception applies "when the state seeks to impose a monetary penalty to enforce a substantive prohibition against unlawful conduct" and that "action is punitive rather than compensatory." *Ante* at ___. But the Court's new rule obfuscates over a century of our sovereign immunity jurisprudence. As previously noted, our precedent before and after *Reata* unequivocally involved "substantive" claims, both statutory and under the common law, and many involved the imposition of "penalties." *See, e.g.*, *Anderson, Clayton & Co.*, 62 S.W.2d at 110 ("[T]he jurisdiction of the court cannot afterwards be defeated by the state upon a plea that the cross-petitioners were seeking an injunction against the enforcement of a penal statute.").

When any governmental body brings suit, it necessarily acts under its sovereign authority to police and enforce the laws of the State. *See Reata*, 197 S.W.3d at 384 (Brister, J., concurring) ("[W]hen governments bring suit, they must do so through agents who ultimately derive their authority from the Legislature. . . . But when they file suit on an affirmative claim, they must be doing so with legislative authorization. If the rule were otherwise, it is not clear how a government could ever assert its own claims."). The Court's decision today throws what has been a well-

18

settled doctrine into limbo because almost any action brought by a governmental body arguably constitutes a "law-enforcement" action.[19]

I see no principled basis for adopting the State's position that the Medicaid Fraud Act enables it to bring a specialized law-enforcement action that justifies an exception to the *Reata* rule. By participating in the federal Medicaid program and enacting the Act and its enabling regulations, the Legislature has already established a balanced statutory scheme for protecting the public against fraud. Under federal law, a state must have a "Medicaid fraud control unit," 42 U.S.C. § 1396a(a)(42)(B)(ii)(IV)(cc), which investigates program violations and can refer matters for criminal prosecution or "to an appropriate State agency" for other action, 42 C.F.R. § 1007.11(b)(3) (2018). In Texas, such enforcement actions can take the form of criminal,[20] administrative,[21] and civil proceedings.[22] Here, if the State desired the deference and protection of its sovereignty, it could have brought (and can still bring) a criminal action against the Providers in this case, subject to, of course, the corresponding burden of proof. Likewise, the State could (and did) bring an administrative action for sanctions for the same alleged violations. The State

---

[19] *See, e.g.,* TEX. AG. CODE §§ 17.152, .153 (providing for civil action for actual damages, treble damages, and civil penalties, or action under the DTPA for failing to post notice of fuel tax rates, or document or record those rates); TEX. BUS. & COM. CODE §§ 15.21 (providing that any "person or governmental entity" who is harmed by unfair trade practices under the Antitrust Act "shall recover" actual damages, interest, and treble damages), 17.953 (providing for the State's recovery of restitution and civil penalties for violations of the Deceptive Trade Practices Act); TEX. INS. CODE § 541.151 (providing for civil penalties for unfair competition and deceptive acts in insurance industry); TEX. OCC. CODE §§ 351.603, .604 (providing for civil penalties for violations of the Optometrists Act).

[20] *See* TEX. PEN. CODE § 35A.02(a)(1)–(12); *see also* TEX. HUM. RES. CODE § 32.0391 (establishing a criminal offense for kickback and bribery schemes).

[21] *See* TEX. HUM. RES. CODE §§ 32.039 (outlining "Damages and Penalties" the State may seek in an administrative action against a provider accused of Medicaid fraud), 36.006 ("The application of a civil remedy under this chapter does not preclude the application of another common law, statutory, or regulatory remedy, except that a person may not be liable for a civil remedy under this chapter and civil damages or a penalty under Section 32.039 if the civil remedy and civil damages or penalty are assessed for the same act.").

[22] *See id.* §§ 36.002 (defining "Unlawful Acts" relating to Medicaid fraud), .052 (establishing "civil remedies" and authorizing the State to initiate an action for civil remedies or an injunction under the Act).

was certainly entitled to pursue this civil action in lieu of its nonsuited administrative claims, *see Albert*, 354 S.W.3d at 375 ("Under litigation rules applicable to ordinary litigants . . . the City was entitled to nonsuit its [claims]."), but "preventing all offsetting claims" by creating a law-enforcement exception here "looks less like sovereign immunity than sovereign inequity," *Reata*, 197 S.W.3d at 383 (Brister, J., concurring).

### D. Connected, Germane, and Defensive Nature of Counterclaims

Finally, the Court concludes that *Reata* does not apply to the Providers' counterclaims because they are not connected, germane, and properly defensive to the State's Medicaid fraud claims. Considering the underlying allegations, the appropriate legal standard, and the State's burden on the merits, I cannot agree with this conclusion.

Where, as here, a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009). Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We must construe the pleadings liberally in favor of the nonmovant and look to the nonmovant's intent. *Heinrich*, 284 S.W.3d at 378.

We explained in *Albert* that counterclaims are "germane"—that is, "relevant"—to the government's claims when they are based on the same question as the government's claim, and are "properly defensive" when they "would at least inferentially rebut" the government's allegations. 354 S.W.3d at 375. Here, the State claims that the Providers committed unlawful acts by submitting prior-authorization and post-treatment-payment requests and then accepting

20

payments even though the services they provided did not qualify for reimbursement under the Medicaid program. The Providers' breach of contract and conspiracy counterclaims are based on their allegations that the State had an independent duty to determine whether the patient qualified for the services, that the State (through and in conspiracy with its contractor, Xerox) failed to fulfill that duty, and that the Providers reasonably relied on the State's decisions when providing the services. And the Providers' conversion counterclaim is based on the State's continued retention of Medicaid funds under a payment hold initiated on the same allegations, same facts, and same defendants as the State's failed administrative cases.

Unlike the Court, I conclude that the counterclaims are relevant and defensive to the State's claims. On the merits, the State must show that the Providers acted "knowingly" in undertaking the unlawful acts defined in the statute. *See* TEX. HUM. RES. CODE § 36.002. The Providers allege that the State and Xerox conspired to mislead the Providers into believing that their requests complied with the Program's requirements. As the Providers frame their complaint, "the State now seeks to recoup the payments that it made to the [Providers] after the [Providers] provided the very services the State had deemed to be medically necessary." (Footnote omitted). Thus, contrary to the Court's conclusion, the Providers' allegations, if true, negate the State's assertion that they knew the services submitted for reimbursement were not medically necessary, which is a material element of each of the State's claims. These allegations are clearly connected and relevant to the parties' claims, and if the Providers are correct, their counterclaims will rebut the allegations on which the State's claims are based. *See State v. Martin*, 347 S.W.2d 809, 814 (Tex. 1961) ("Appellee's claim to recover the very money which the State seeks to retain, the claim of each arising from the same single transaction between the parties, could not be more closely related or

21

more germane."). Applying the appropriate standard of review at this early stage in the proceedings, I must conclude that the Providers have met their burden of alleging facts overcoming the State's assertion of immunity.

### III. Conclusion

When we explained the limited scope of the government's immunity against counterclaims in *Reata*, we relied on the policies that justify the doctrine in the first instance. Because the *Reata* rule permits only germane and properly defensive counterclaims and permits relief only in the form of an offset against the government's monetary recovery, we concluded that it "would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it." 197 S.W.3d at 375–76. For the reasons explained, I reach the same conclusion here and would hold that the State is not entitled to dismissal of the Providers' counterclaims. Because the Court holds otherwise, I must respectfully express my dissent.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 22, 2018