# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00637-CV

**Officials Acting in Their Official Capacities for the City of Austin Development Services Department: Denise Lucas, in her Official Capacity as Director; Rick Holloway, in his Official Capacity as Assistant Director; David Chapman, in his Official Capacity as Development Services Division Manager; Mario Garcia, in his Official Capacity as Environmental Compliance Supervisor; Brian Eagan, in his Official Capacity as Environmental Compliance Specialist Senior; Robert Jason Crouch, in his Official Capacity as Environmental Compliance Specialist Senior, Appellants**

**v.**

**Austin Nightlife, LLC d/b/a Summit Lounge, Appellee**

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-006221, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After it was cited for violating the terms of its outdoor-music-venue permit and various municipal noise ordinances, Austin Nightlife, LLC d/b/a Summit Lounge sued various officials with the Development Services Department at the City of Austin[1] (collectively, the City Officials) seeking declaratory and injunctive relief for what it contends are ultra vires acts. The City Officials filed a plea to the jurisdiction, which the trial court denied. In this interlocutory

---

[1] Those officials are Denise Lucas, in her Official Capacity as Director; Rick Holloway, in his Official Capacity as Assistant Director; David Chapman, in his Official Capacity as Development Services Division Manager; Mario Garcia, in his Official Capacity as Environmental Compliance Supervisor; Brian Eagan, in his Official Capacity as Environmental Compliance Specialist Senior; Robert Jason Crouch, in his Official Capacity as Environmental Compliance Specialist Senior.

appeal, the City Officials assert that the trial court erred in denying their plea to the jurisdiction because they are protected from suit by governmental immunity and because Austin Nightlife has failed to assert any valid ultra vires claims. We will affirm the trial court's order in part and reverse and render in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Chapter 9-2 of the Austin City Code regulates noise and amplified sound in the city, including the decibel levels and times at which sound equipment may be operated at outdoor-music venues. *See* Austin, Tex., Code of Ordinances §§ 9-2-1−65 ("Noise and Amplified Sound"). Generally, under Section 9-2-30(A)(1), sound equipment for which an outdoor-music-venue permit has been issued may be operated up to 85 decibels until 10:30 p.m. on Sunday through Wednesday, until 11:00 p.m. on Thursdays, and until 12:00 midnight on Fridays, Saturdays, and New Year's Eve. *See id.* § 9-2-30(A)(1) ("Decibel Limits for Outdoor Music"); *see also id.* §§ 9-2-35−65 ("Live Music Permits"). Under certain enumerated exceptions, however, an outdoor-music venue may operate sound equipment as late as 2:00 a.m. *See id.* § 9-2-30(A)(1)-(4). Relevant here, Section 9-2-30(A)(2) allows outdoor-music venues located in the "Warehouse District," as designated by City ordinance, to operate permitted sound equipment until 2:00 a.m. on all days of the week. *Id.* § 9-2-30(A)(2). In addition, Section 9-2-30(A)(3) of the Code provides that "during the spring festival season" (which coincides with the South-by-Southwest music festival) a venue may operate permitted sound equipment until 2:00 a.m., whether or not located within the Warehouse District. *Id.* § 9-2-30(A)(3).

Austin Nightlife operates a roof-top lounge called Summit Lounge in downtown Austin at 120 West Fifth Street. On Austin Nightlife's application, the City's Development

Services Department issued the lounge an outdoor-music-venue permit and sound-impact plan. *See id.* §§ 9-2-39 ("Outdoor Music Venue Permit"), 9-2-41 ("Sound Impact Plan"). The permit and sound-impact plan indicate that Summit Lounge is not located in the Warehouse District but instead is in the "Outside" district, i.e., in the central business district "among other bars, restaurants, and residential uses." The permit allows Summit Lounge to operate sound equipment outdoors until 12:00 midnight on Fridays and Saturdays, until 11:00 p.m. on Thursdays, and until 10:30 p.m. on all other days.

After receiving citations for violations of its permit and of Chapter 9-2 noise ordinances, Austin Nightlife filed suit against the City Officials for what it contends are three instances of ultra vires conduct. First, Austin Nightlife's petition alleged that the City Officials have improperly refused to recognize that Summit Lounge is located in the Warehouse District, as defined in Section 9-2-1(19) of the Austin City Code, and that, as a result, it is entitled under Section 9-2-30(A)(2) to the extended hours of operation applicable to outdoor-music venues in the Warehouse District.

Second, Austin Nightlife alleged that during the South-by-Southwest music festival it "sought confirmation [from the Development Services Department] that [Summit Lounge], like all of the other venues, was allowed to operate during the extended hours," as provided by Section 9-2-30(A)(3) of the Code. According to Austin Nightlife's petition, the City Officials wrongfully refused to provide this confirmation and instead notified Austin Nightlife that if it wanted to operate at the extended hours applicable during the spring festival season, it had to first apply for and obtain a temporary modification of its sound-impact plan.

Finally, Austin Nightlife alleged that the City Officials acted "ultra vires in issuing or causing to be issued citations against [Austin Nightlife] for noise violations because

3

the officers that issued the violations were not properly designated as required under Section 9-2-1(1) and no portion of [Chapter 9-2] of the City Code authorizes the accountable official to cause a citation to be issued." Austin Nightlife seeks declaratory and injunctive relief (1) prohibiting the City Officials from "unlawfully issuing citations against [Austin Nightlife] for noise violations contrary to requirements laid out in City of Austin Code of Ordinances," and (2) compelling the City Officials to "represent in all future permits and sound-impact plans that the Summit Lounge is located in the Warehouse District."

In response, the City Officials filed a plea to the jurisdiction asserting that Austin Nightlife's claims are barred by governmental immunity. Following an evidentiary hearing, the trial court denied the City Officials' plea. This interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

## STANDARD OF REVIEW

Subject-matter jurisdiction is essential to the authority of a court to decide a case. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex. 2000). A plea to the jurisdiction is a dilatory plea that challenges the trial court's subject-matter jurisdiction without regard to whether the asserted claims have merit. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Whether a trial court has subject-matter jurisdiction is a question of law, and we review a trial court's ruling on a plea to the jurisdiction de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225 (Tex. 2004).

The burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012). When, as in this case, the defendant's plea to the jurisdiction challenges the sufficiency of the plaintiff's

4

pleadings, we determine if the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Miranda*, 133 S.W.3d at 226. In making this assessment, we construe the plaintiff's pleadings liberally, taking all assertions as true, and look to the plaintiff's intent. *Id.* If the plaintiff meets its burden of affirmatively demonstrating the trial court's jurisdiction, the plea to the jurisdiction should be denied. *See In re Diocese of Lubbock*, 624 S.W.3d 506, 512 (Tex. 2021) (orig. proceeding). When resolving issues presented by a plea to the jurisdiction, a court may consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional issues. *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555.[2]

If resolution of the jurisdictional issue requires the trial court to construe municipal ordinances, we likewise review these questions de novo. *Powell v. City of Houston*, 628 S.W.3d 838, 842 (Tex. 2021). In construing an ordinance, we apply the same rules that are used to construe statutes. *Id.* Thus, our primary objective in construing an ordinance is to ascertain and give effect to the enacting body's intent. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). To discern that intent, we start with the plain and ordinary meaning of the ordinance's words, using any definitions provided by the enacting body. *See Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). We consider an ordinance as a whole, rather than isolated provisions, and we do not give an undefined term a meaning that is out of harmony or inconsistent with other provisions, even though it might be

---

[2] When a plea to the jurisdiction challenges the existence of jurisdictional facts that implicate the merits of the plaintiff's claims, the movant's burden mirrors that of a traditional summary-judgment motion. *Texas Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021). Here, the City Officials neither challenged the existence of any jurisdictional facts alleged by Austin Nightlife nor submitted evidence in an attempt to negate the existence of such facts. Nevertheless, at the hearing on the plea to the jurisdiction, Austin Nightlife presented documentary evidence in support of its claims, and the City Officials did not attempt to dispute that evidence.

5

susceptible to such a construction standing alone. *Texas State Bd. of Chiropractic Exam'rs v. Abbott*, 391 S.W.3d 343, 347 (Tex. App.—Austin 2013, no pet.) (citing *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)).

## DISCUSSION

Sovereign immunity implicates a court's subject-matter jurisdiction and generally bars suits against the State and its subdivisions, such as agencies and boards, absent a clear and unambiguous waiver of immunity by the Legislature. *Nazari v. State*, 561 S.W.3d 495, 500 (Tex. 2018). Under the doctrine of governmental immunity, political subdivisions of the state, such as counties and cities, share the state's immunity when performing governmental functions as the state's agent. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 747 (Tex. 2019). Therefore, like sovereign immunity, governmental immunity implicates a court's subject-matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Harris County v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018).

"In certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are ultra vires." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). While governmental immunity provides broad protection to the state and its officers, it does not bar a suit against a government officer for acting outside his legal authority in carrying out his duties—i.e., an ultra vires suit. *See Houston Belt. & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016). Properly pleaded ultra vires suits do not implicate immunity because they do not attempt to exert control over the state but, instead, attempt to reassert the control of the state over its official. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

6

To fall within the ultra vires exception, the plaintiff must allege and ultimately prove that a government official acted without legal authority or failed to perform a purely ministerial act. *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018). A government official fails to perform a ministerial act when "the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Hall*, 508 S.W.3d at 238. A government official acts "without legal authority" when he exceeds the bounds of his granted authority or if his acts conflict with the law itself. *Houston Belt*, 487 S.W.3d at 158.

"Ultra vires claims depend on the scope of the state official's authority," not the quality of the official's decision. *Honors Acad.*, 555 S.W.3d at 68 (quoting *Hall*, 508 S.W.3d at 234). And while an act within the official's discretion is protected by immunity even if it is erroneous, *Hall*, 508 S.W.3d at 242−43, officials generally have no discretion or authority to misinterpret the law, *Houston Belt*, 487 S.W.3d at 163. However, if a plaintiff alleges only facts demonstrating acts within the official's legal authority and discretion, the claim is barred by immunity. *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envt'l Quality*, 307 S.W.3d 505, 516 (Tex. App.—Austin 2010, no pet.).

In reviewing the trial court's jurisdictional ruling, we will examine each of Austin Nightlife's three ultra vires claims in turn to determine whether it has sufficiently alleged a valid ultra vires claim. *See Thomas v. Long*, 207 S.W.3d 334, 338-39 (Tex. 2006) (explaining that it is proper to examine subject-matter jurisdiction on claim-by-claim basis because "it is proper for a trial court to dismiss claims over which it does not have subject matter jurisdiction but retain claims in the same case over which it has jurisdiction").

7

*Status as a Warehouse District Venue*

In its first claim, Austin Nightlife alleged that the City Officials acted ultra vires by failing to recognize that Summit Lounge is located within the City's Warehouse District and is therefore entitled under Section 9-2-30(A)(2) to operate sound equipment at later hours. Section 9-2-1(19) of the Code defines the "Warehouse District" as follows:

> WAREHOUSE DISTRICT means the area:
>
> (a) that begins at the intersection of Congress Avenue and Cesar Chavez Street;
>
> (b) north along Congress Avenue to Fifth Street (West);
>
> (c) west along Fifth Street (West) to Guadalupe Street;
>
> (d) south along Guadalupe Street to Cesar Chavez; and
>
> (e) east along Cesar Chavez Street to Congress Avenue, the place of beginning.

*See* Austin, Tex., Code of Ordinances § 9-2-1(19). Under this definition, the Warehouse District is a geographic area, the boundaries of which are "along" designated portions of specific streets. Relevant here, the northern boundary of the Warehouse District is defined as "along" a certain portion of West Fifth Street.

Austin Nightlife's undisputed allegations and evidence establish that Summit Lounge is an outdoor-music venue located on the north side of West Fifth Street. The City Officials construed "Warehouse District" under Section 9-2-1(19) to include only those properties on the south side of Fifth Street, that is, properties within the geographic area created by the streets themselves. Accordingly, they concluded that Summit Lounge was not located in the Warehouse District when they issued the lounge a permit and sound-impact plan, and later

8

when citations for ordinance violations were issued to the lounge.[3]  The map below shows how

the Summit Lounge is situated in relation to the relevant streets of downtown Austin.

---

[3] We note also that the permit and sound-impact plan issued to Summit Lounge appears to expressly exclude the lounge from the Warehouse District.  Although a decision "to approve or deny a permit under [§ 9-2-39] may be appealed," there is no allegation or evidence that Summit Lounge appealed its permit as issued.



Summit Lounge

West 5th Street

West 4th Street

West 3rd Street

West 2nd Street

Cesar Chavez St.

Guadalupe Street

Lavaca Street

Colorado Street

Congress Avenue

Austin Nightlife contends that the City Officials have acted "without legal authority" in concluding that Summit Lounge is not in the Warehouse District because, in its view, the City Officials' interpretation of Section 9-2-1(19) conflicts with the unambiguous language of the ordinance. *See Houston Belt*, 487 S.W.3d at 158. Austin Nightlife reasons that the term "along Fifth Street" in Section 9-2-1(19) necessarily means properties on both sides of Fifth Street and, consequently, that Summit Lounge's location on the north side of the street qualifies as "along Fifth Street." Thus, according to Austin Nightlife, the City Officials' refusal to recognize Summit Lounge as being in the Warehouse District constitutes an ultra vires act.

In its plea, and now on appeal, the City Officials do not argue that their authority to recognize or refuse to recognize that "an outdoor music venue" is located "in the Warehouse District" is absolute. *See id.* at 165 (explaining that "only absolute grants of authority will totally bar judicial review"). Instead, the City Officials contend that the limit of their authority in determining a venue's Warehouse-District status under Section 9-2-1(19) is the ordinance itself; that the ordinance is, at worst, ambiguous as to whether it includes properties on the north side of Fifth Street; that as the governmental entity charged with enforcing City noise ordinances, its officials have the authority and discretion to reasonably interpret Section 9-2-1(19); and, finally, that their interpretation of Section 9-2-1(19)—that is, that a property is in the Warehouse District only if it is located within the geographic area created by the boundary streets—is a reasonable interpretation.

As the parties recognize in their respective arguments, whether the City Officials acted ultra vires in failing to recognize Summit Lounge as being within the Warehouse District turns on the scope of the officials' discretion to interpret the language of Section 9-2-1(19). Unless the terms of the ordinance unambiguously place Summit Lounge within the Warehouse

11

District, the City Officials have discretion to construe the boundaries of that district. In interpreting Section 9-2-1(19), we start with the words of the ordinance to discern the city's intent. *See CPM Tr. v. City of Plano*, 461 S.W.3d 661, 670 (Tex. App.—Dallas 2015, no pet.) (explaining that when construing city ordinance, "we rely on the plain meaning of the text as expressing [the city's] intent") (citing *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010))). In the context of the present case, whether the City Officials were acting "without legal authority," *see Houston Belt*, 487 S.W.3d at 158, turns on interpretation of the ordinance's use of the term "along."

Although the term "along" is not defined in Chapter 9-2, when used as a preposition it is ordinarily defined as "in a line matching the length or direction of." *See Along*, *Merriam-Webster Online Dictionary*, https://merriam-webster.com/dictionary/along (last visited April 19, 2023). Accordingly, the relevant ordinance can reasonably be read to begin at a particular point, i.e., "the intersection of Congress Avenue and Cesar Chavez Street." Applying the foregoing definition of "along," the ordinance could logically be construed to produce a line proceeding down each named street to the place where that street reaches the intersection with the next named street. Such a use of "along" is not uncommon in setting boundary lines. *See, e.g., Lebow v. Weiner,* 454 S.W.2d 869, 871 (Tex. App.—Beaumont 1970, writ ref'd n.r.e.) ("ONE HUNDRED FIFTY (150 ft.) feet, along the Feeder Road"); *State ex rel. Beckville Indep. Sch. Dist. v. Tatum Indep. Sch. Dist.*, 283 S.W.2d 802, 808 (Tex. App.—Texarkana 1955, writ ref'd n.r.e.) ("[T]he true boundary line between the Beckville District and the Tatum District runs along the Yellow Jacket Road."); *Krider v. Hempftling*, 137 S.W.2d 83, 85 (Tex. App.—Galveston 1940, no writ) ("thence S. 41½ [varas] E. along the center of said public road to the beginning"); *Brown v. St. Mary's Temple No. 5, etc.*, 127 S.W.2d 531, 532 (Tex. App.—Dallas

1939, no writ) ("Thence northeast along said alley 113 feet.").  Although the ordinance here does not specify whether the line runs down the center of each named street or along one side or the other, that is immaterial—the street can reasonably be interpreted to be the boundary. Thus, based on the plain language of Section 9-2-1(19), we cannot conclude that the use of the term "along" unambiguously includes properties located on both sides of the boundary streets or that it precludes the streets themselves from constituting the Warehouse District's boundary lines.

We therefore disagree with Austin Nightlife's contention that the definition of Warehouse District under Section 9-2-1(19) unambiguously provides that the northern boundary of the Warehouse District includes those properties located on both sides of West Fifth Street. Consequently, the City Officials' construction of Section 9-2-1(19) to exclude Summit Lounge from the Warehouse District does not conflict with the plain language of the ordinance and therefore does not constitute an act "without legal authority."  *See Houston Belt*, 487 S.W.3d at 158.  As a result, Austin Nightlife's allegation that the City Officials wrongfully failed to recognize Summit Lounge as located within the Warehouse District, even construed in the light most favorable to Austin Nightlife, does not state a valid ultra vires claim.  The trial court therefore erred in denying the City Officials' plea to the jurisdiction as to this claim.

### Extended Hours During the Spring Festival Season

In its second claim, Austin Nightlife asserts that the City Officials acted ultra vires in requiring Summit Lounge to apply for a temporary modification of its permit and sound-impact plan to obtain extended 85-decibel hours during the spring festival season.  *See* Austin, Tex., Code of Ordinances § 9-2-41(B), (C) (providing that sound-impact plan includes, among other elements, "prescribed decibel limits and hours of operation" and that "accountable official

13

may modify sound-impact plan" after permit has been issued). Austin Nightlife alleges that this action by the City Officials "violate[s] the clear language of City Code Section 9-2-30(A)(3), which operates to automatically extend venue hours during the [South-by-Southwest music festival] season."

As previously discussed, Section 9-2-30(A)(3) of the Code provides that permitted sound equipment may be operated "[u]p to 85 decibels during the spring festival season, between 10:00 a.m. and 2:00 a.m." *Id* § 9-2-30(A)(3). The "spring festival season" is defined by ordinance as "Friday of the second week of March through Sunday during the third week of March, unless the city manager designates an alternate ten-day period for a particular year." *Id.* § 9-2-1(15). Although Section 9-2-30(A) qualifies that the operation of sound equipment is authorized at specified decibel levels "*unless a more restrictive decibel limit is required* by a sound-impact plan, a condition in an outdoor-music venue permit, or by another provision of this code," there is no such qualification as to hours of operation. *See id.* § 9-2-30(A) (emphasis added). Austin Nightlife's permit and sound-impact plan, which were admitted into evidence at the hearing on the City's plea, allow Summit Lounge to operate at up to 85 decibels during its permitted hours and therefore do not impose "a more restrictive decibel limit" than that allowed under Section 9-2-30(A).

The language of Section 9-2-30(A)(3) contains no requirement for an outdoor-music venue to modify its permit or sound-impact plan before it may operate sound equipment under the extended hours applicable during the spring festival season. As worded, the ordinance can be read to "leave nothing to the exercise of discretion or judgment" of the City Officials. That is, it appears to be unambiguous. Consequently, construing the pleadings liberally in favor of Austin Nightlife, we conclude that its pleadings are sufficient to give the trial court

14

jurisdiction over its claim that City Officials acted ultra vires in refusing to allow Summit Lounge to operate sound equipment at 85 decibels until 2 a.m. during the spring festival season. The trial court did not err in denying the City Officials' plea to the jurisdiction as to this claim.

*Designated Authority*

Finally, Austin Nightlife alleges that the City Officials here lacked any authority to issue or cause citations to be issued for noise-ordinance violations "because the officers who issued the violations were not properly designated [as accountable officials] as required under Section 9-2-1(1) and no portion of [Chapter 9-2] of the City Code authorizes the accountable official to cause a citation to be issued."

Contrary to Austin Nightlife's assertion, we cannot conclude that only a specific "accountable official," as defined in Chapter 9-2, has the authority to issue citations or cause citations to be issued. Section 9-2-1(1) defines "accountable official" as "the City officer or employee designated by the city manager with a *particular* administrative or enforcement responsibility under [Chapter 9-2]." *Id*. § 9-2-1(1) (emphasis added). Other provisions in Chapter 9-2 specify the particular responsibilities of an "accountable official." Those responsibilities generally concern permitting. For example, Chapter 9-2 provides that the "accountable official" is responsible for approving or denying outdoor-music-venue permit applications, issuing sound-impact plans, and suspending or revoking permits. *Id.* §§ 9-2-39 (accountable officials may issue permit); 9-2-41(C) (accountable official may modify sound-impact plan); 9-2-53 (decision on application by accountable official); 9-2-54 (notice of application by accountable official). Nothing in Chapter 9-2 suggests that enforcement activities such as the issuance of citations are the "particular" responsibilities of the "accountable official."

In contrast, Chapter 1-1 of Austin City Code, General Provisions, authorizes a director of a city department (which would include the Development Services Department) to issue citations "if the director reasonably believes the person has engaged in conduct that violates a law or ordinance that the director is responsible for enforcing." *Id.* § 1-3-2 ("Authority to Issue Citations to Appear in Municipal Court").[4] In addition, a department director may designate employees to issue citations. *Id.* § 1-3-3 ("Designated Employees"). Austin Nightlife has not alleged or argued that the citations against Summit Lounge for noise-ordinance violations were not issued or caused to be issued by a department director or by an employee designated by the director under Section 1-3-3.

In summary, the City Officials' issuance of citations through authorized employees does not conflict with the plain language of Section 9-2-1(1) and therefore does not constitute an act "without legal authority." *See Houston Belt*, 487 S.W.3d at 158. The allegations in Austin Nightlife's pleadings, liberally construed, fail to affirmatively demonstrate the trial court's jurisdiction as to its claim that the City Officials acted ultra vires "in issuing or causing to be issued citations against Summit Lounge for noise violations." The trial court erred in denying the City Officials' plea to the jurisdiction as to this claim.

**CONCLUSION**

Because the trial court erred in denying the City Officials' plea to the jurisdiction as to Austin Nightlife's claim based on Section 9-2-1(19), concerning its status as a Warehouse District venue, and its claim based on Section 9-2-1(1), concerning whether citations were issued or caused to be issued by an "accountable official," we reverse the trial court's order as to these

---

[4] A violation of the City's noise ordinances under Chapter 9-2 or of a sound-impact plan is considered a chargeable offense. *See* Austin City Code §§ 9-2-61(A), 9-2-3(D).

claims and render judgment dismissing these claims for lack of jurisdiction.[5] We affirm the trial court's order denying the City Officials' plea to the jurisdiction as to Austin Nightlife's claim that the City Officials acted ultra vires in requiring Summit Lounge to obtain a temporary modification of its permit and sound impact plan in order to be authorized to use extended 85-decibel hours during the spring festival season.[6]

_____

J. Woodfin Jones, Justice[*]

Before Justices Baker, Smith, and Jones[*]

Affirmed in part; Reversed and Rendered in part

Filed:   April 20, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).

---

[5] As previously discussed, a trial court generally should give a plaintiff an opportunity to amend its pleadings before granting a plea to the jurisdiction that challenges the sufficiency of the plaintiff's pleadings. *Houston Belt. & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016).  Here, however, Austin Nightlife had an opportunity to amend its pleadings— and did so—after the City Officials filed their plea to the jurisdiction. *See Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 559 (Tex. 2016) (noting that plaintiffs were not entitled to another opportunity to replead when they "had the opportunity to, and did in fact, amend their pleadings in the trial court after the [defendant] filed its plea to the jurisdiction").  Moreover, the jurisdictional defects in Austin Nightlife's pleaded claims arise from the nature of the claims and not from a lack of factual allegations.  *See id*. (explaining that remand "is a mechanism for parties . . .  to plead facts tending to establish [] jurisdiction" and not for parties to plead new claims).  Consequently, we need not give Austin Nightlife another opportunity to replead.

[6] In conjunction with the instant opinion and judgment, we lift the temporary stay entered by this Court on October 25, 2022.

17